**FLEMING, Adm'r of Wage and Hour Div., Dept. of Labor, v. MONTGOMERY WARD & CO., Inc.**

·No. 7213.

Circuit Court of Appeals, Seventh Circuit.

July 18, 1940.

Writ of Certiorari Denied Oct. 28, 1940.

See 61 S.Ct. 71, 85 L.Ed. ——.

---

John A. Barr, Walker Smith, and Stuart S. Ball, all of Chicago, Ill., for appellant.

Geo. A. McNulty, Gen. Counsel, Wage and Hour Division, Dept. of Labor, and Irving J. Levy, Asst. Gen. Counsel, both of Washington, D. C., Alex Elson, Regional Atty., of Chicago, Ill., Robert S. Erdahl, Atty., of Washington, D. C., Lee K. Beznor, Atty., of Chicago, Ill., David Persinger, Atty., of Washington, D. C., and John

K. Evans, Atty., of Chicago, Ill., for appellee.

Before TREANOR and KERNER, Circuit Judges, and WILKERSON, District Judge.

TREANOR, Circuit Judge.

This is an appeal from the order of the District Court requiring respondent to comply with a subpœna duces tecum which had been issued by petitioner pursuant to authorization of the Fair Labor Standards Act of 1938.[1]

Respondent is a corporation engaged in a general merchandising business carried on throughout the United States, and maintains and operates one of its branches in Kansas City, Missouri. This branch consists of a mail order house and a retail store; and at least 80% of the goods received by such mail order house is shipped from sources without the state of Missouri and the mail order house sends, transports and sells merchandise to points outside the state. Respondent's operation of its Kansas City plant brings it within the. terms of the Fair Labor Standards Act as an employer of employees engaged in interstate commerce or in the production of goods for interstate commerce.

Petitioner undertook an investigation of the acts and practices of respondent in its Kansas City branch relating to hours of employment, wages paid, classification of employees, and discriminatory acts. By the terms of the Fair Labor Standards Act, which will be referred to hereinafter as the "Act," the petitioner is authorized, as Administrator of the Wage and Hour Division, United States Department of Labor, to conduct investigations of the acts and practices of respondent relating to the foregoing subjects.

In the course of the investigation petitioner issued a subpœna duces tecum which required the respondent to produce (1) the records of a six months period showing wages paid to, and timeclock cards of, employees in the mail order branch at Kansas City, (2) the records showing the number of hours scheduled for each department of the mail order branch for the same period, and (3) the record of the actual number of hours worked by each of the departments during such period. Respondent refused to comply with the subpœna and petitioner thereupon applied to the District Court for an enforcement order.[2] As a result of the proceeding in the District Court the respondent was ordered to appear before petitioner and produce the records designated in items one and two of the subpœna.

Respondent does not urge that the Act is unconstitutional, but does urge that the requirements of the subpœna were unreasonable and that its enforcement would operate to deprive respondent of its rights under the Fourth Amendment to the Federal Constitution.[3] Respondent further urges that the trial court's refusal to permit it to develop the facts surrounding the issuance of the subpœna duces tecum deprived respondent of its day in court.

Petitioner averred below that he had reasonable grounds to believe that respondent had violated the provisions of Sections 7, 11(c), 15(a) (1), (2), (3), and (5), and certain regulations which had been promulgated under authority of the Act. Respondent answered that petitioner had no reasonable cause to suspect the existence of violations of the Act. And on appeal respondent urges as one ground of error by the District Court that respondent was not permitted to introduce evidence for the purpose of showing that the petitioner had no reasonable cause to believe that respondent was violating the Act. And in conjunction with the foregoing respondent argues that, in the absence of a showing of reasonable cause to believe that respondent was violating the Act, the issuance and enforcement of the subpœna duces tecum would constitute an unreasonable search and seizure.

We shall consider first petitioner's claim that he may inspect respondent's records relating to matters regulated and controlled by the Act without showing reasonable grounds to believe that a violation of the Act has occurred.

Respondent is a corporation and as such is not protected by immunity against self-incrimination which is guaranteed by

[1] 52 Stat. 1060, 29 U.S.C.A. § 201, et seq.

[2] Petitioner's application for an enforcement order omitted the record of hours actually worked by each of the departments, in reliance upon the statement of respondent that it did not have such a record.

[3] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

the Fifth Amendment.[4] Hence, the forced production of the records cannot be said to be unreasonable because it might deprive respondent of the benefit of immunity against self-incrimination. A corporation is entitled, however, to the protection of the Fourth Amendment against unreasonable searches and seizures of its papers.[5]

■ The scope and purpose of the Act, the proper exercise of the authority conferred upon the Administrator. and the effective performance of his duties, are inconsistent with an intention to limit inspections of books and records to cases in which the Administrator has reasonable cause to believe an employer is violating the provisions of the Act.

Section 2 of the Act sets out a legislative finding and declaration of policy which constitute the legislative justification of the Act as a regulation of commerce. Congress declares, as a finding of fact, that the existence in industries engaged in interstate commerce or in the production of goods for such commerce, of labor conditions detrimental to the maintenance of a minimum standard of living necessary for health, efficiency, and well-being of workers affect interstate commerce; and Congress declares that the policy of Congress is to eliminate such conditions. Section 4 creates a Wage and Hour Division (in the Department of Labor) which is placed under the direction of an Administrator. The Administrator is required to make an annual report to Congress of his activities, such report to include "such information, data, and recommendations for further legislation in connection with the matters covered by (the) Act [this chapter] as he may find advisable." Section 5 requires the Administrator to appoint an "industry committee" for each industry, and Sections 6 and 7 fix a minimum wage standard and a maximum hour standard, respectively. Section 8, in conjunction with Section 6(a) (3) and (4) provides for the investigation of industry conditions by the industry committee and for a recommendation of minimum wage rates and classifications within the industry. The Administrator is required to approve or disapprove of such recommendations. Section 11(a) authoriz-

es the Administrator to "investigate and gather data regarding the wages, hours, and other conditions and practices of employment * * *, and [to] enter and inspect such places and such records * * * and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provision of (the) Act [this chapter], or which may aid in the enforcement of the provisions of (the) Act [this chapter]." Section 11(c) requires employers to make and keep records of wages, hours and other conditions of employment and to make reports therefrom, as prescribed by regulations of the Administrator "as necessary or appropriate for the enforcement of the provisions of (the) Act [this chapter] * * *." And in conformity with the foregoing the respondent has made certain regulations regarding the making and keeping of records.

It is apparent from this cursory analysis of pertinent provisions of the Act that Congress has conferred upon the Administrator of the Wage and Hour Division broad powers of regulation and supervision which are accompanied, for the purpose of giving effect thereto, by investigatory duties and powers which are designed especially to enable the Administrator to have available at all times detailed information respecting the conditions and practices of employment, including information respecting wages and hours of labor. The duties of the Administrator go far beyond the relatively simple task of instituting punitive actions against employers for occasional violations of the Act. The Administrator is authorized to inspect in order "to determine whether any person has violated the Act," not merely to corroborate a previously formed belief of violation; and he is authorized to make inspections "which may aid in the enforcement" of the Act. Section 4(d) requires the Administrator to make an annual report to Congress which shall include "information, data, and recommendations for further legislation in connection with the matters covered by (the) Act [this chapter] * * *." The Administrator, in conjunction with the industry committee, enjoys a wide discre-

4 Hale v. Henkel, 201 U.S. 43, 73, 26 S.Ct. 370, 50 L.Ed. 652; Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; Baltimore & Ohio R. Co. v. Interstate Commerce Commission, 221 U.S. 612, 31 S.Ct. 621, 55 L.Ed. 878.

5 Hale v. Henkel, supra; Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786.

388

tion in fixing minimum wage rates and maximum hours. The Administrator is required to submit to the committee "from time to time such data as he may have available on the matters referred to it." Section 11(c) empowers the Administrator to prescribe by regulation the making and keeping of records of "wages, hours, and other conditions and practices of employment."

We are of the opinion that the terms of the Act necessarily indicate a legislative intent that the exercise of the investigatory powers of the Administrator be in no degree conditioned upon the existence of reasonable cause for the Administrator to believe that the industry, which is the subject of investigation, is violating the Act.

Respondent insists that "no case has upheld a search and seizure in the absence of probable cause * * * except when the search and seizure has been directed against a public utility, common carrier, or the like." But even if we assume the accuracy of the statement, it does not follow that the decisions hold that probable cause is dispensed with only in case of public utility corporations. And we are of the opinion that the cases do not so hold.

In Hale v. Henkle, supra note 4, the Supreme Court indicates that the test of validity of an order of production of records of a corporation is reasonableness of the order under the circumstances, and points out why the subpœna duces tecum, which was under investigation, violated the standard of reasonableness. The Court stated that the search and seizure clause of the Fourth Amendment was not intended to interfere with the power of courts to compel, through a subpœna duces tecum, the production upon a trial in court, of documentary evidence; but the Court also stated that an order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment. The Court was of the opinion that the subpœna before it was "too sweeping" and stated that if the writ had required the production of all books, papers and documents of the corporation "it would scarcely be more universal in its operation." [201 U.S. 43, 26 S.Ct. 380, 50 L.Ed. 652.]

But of special significance in the instant investigation is the statement of the Supreme Court in the foregoing case that "in view of the power of Congress over interstate commerce * * * we do not wish to be understood as holding that an examination of the books of a corporation, if duly authorized by act of Congress, would constitute an unreasonable search and seizure within the 4th Amendment."

In Wilson v. United States, supra note 4 [221 U.S. 361, 31 S.Ct. 545, 55 L.Ed. 771, Ann.Cas.1912D, 558], the Supreme Court stated that the "corporate form of business activity, with its chartered privileges, raises a distinction when the authority of government demands the examination of books"; and that the corporation had no privilege to refuse a demand "expressed in lawful process, confining its requirements within the limits which reason imposes in the circumstances of the case." And although the object of the inquiry may be to discover violations of law and to inflict punishment "it must submit its books and papers to duly constituted authority when demand is suitably made." The foregoing limitation on immunity "is involved in the reservation of the visitatorial power of the state, and in the authority of the national government where the corporate activities are in the domain subject to the powers of Congress."

In Essgee Company of China v. United States [6] the Supreme Court stated that corporations do not enjoy the same immunity against investigations and inspections of records that individuals have under the Fourth and Fifth Amendments; and in a more detailed statement announces a workable test, as follows: "* * * a corporation can only be compelled to produce its records against itself by the demand of the government expressed in lawful process, confining its requirements within limits which reason imposes in the circumstances of the case. It is to submit its books and papers only to 'duly constituted authority when demand is suitably made.' In the case before us the demand was suitably made [subpœna duces tecum] by duly constituted authority [Federal Grand Jury]. * * * [The demand] was expressed in lawful process, confining its requirements to certain described documents and papers easily distinguished and clearly described. Their relevancy to the subject of investigation was not denied. * * * 'there is no unreasonable search and seizure, where a writ, suitably specific and properly limited in its scope, calls for the production of doc-

[6] 262 U.S. 151, 156, 43 S.Ct. 514, 517, 67 L.Ed. 917.

uments which, as against their lawful owner to whom the writ is directed, the party procuring its issuance is entitled to have produced.' "

■ The reasoning and holding of the Supreme Court in the foregoing cases are inconsistent with the contention that enforced inspection of the books and records of a corporation constitutes an unreasonable search and seizure in the absence of the existence of probable cause to believe that the corporation is guilty of an unlawful act. In general, the cases hold that there must be a demand suitably made by duly constituted authority; that such demand be expressed in lawful process, and that the lawful process limit its requirements to certain described documents and papers which are easily distinguished and clearly described. Also, there must be relevancy to the subject of investigation.

■ The reasoning of the cases, and the tests of lawful inspection are broad enough to apply equally, on principle, to non-public as well as public utility corporations. And we are of the opinion that the decisions of the Supreme Court, and at least one decision of this Court, have established clearly that when Congress, in the exercise of its power under the commerce clause, has created an administrative agency with power to regulate and supervise the conduct of an industry and has authorized such administrative agency to inspect books and records for the purpose of enabling the agency to perform its functions under the Act, the same principles that have been applied to inspection of books and records by the Interstate Commerce Commission are applicable to inspections by such other administrative agency.

In Interstate Commerce Commission v. Brimson[7] the Supreme Court discussed the legal basis of the right of the United States, acting through the Interstate Commerce Commission, to compel production of books, papers and other documents. The legal basis was found not in the fact that the business which was subject to regulation under the Act was a public carrier, but was found in the plenary power of Congress to regulate commerce. In the course of the opinion the Court said that "An adjudication that congress could not establish an administrative body with authority to investigate the subject of interstate commerce, and with power to call witnesses before it, and to require the production of books, documents, and papers relating to that subject, would go far towards defeating the object for which the people of the United States placed commerce among the states under national control." And the Court further said that "All must recognize the fact that the full information necessary as a basis of intelligent legislation by congress from time to time upon the subject of interstate commerce cannot be obtained, nor can the rules established for the regulation of such commerce be efficiently enforced, otherwise than through the instrumentality of an administrative body * * *."

The case of Bartlett Frazier Co. v. Hyde[8] involved regulations of Boards of Trade under the Grain Futures Act.[9] The Grain Futures Act placed the duty upon Boards of Trade of requiring their members to file reports as prescribed by the Secretary of Agriculture, showing the details of their cash and future transactions in grain; and the members were further required to keep a record of such transactions for at least three years, accessible to inspection by representatives of the Departments of Agriculture and Justice. In the course of its opinion the District Court [56 F.2d 246] stated that "to sustain the part of the act prescribing the duty and conferring the power to regulate Boards of Trade and to strike down the part which puts the government in possession of the facts essential to an intelligent performance of its duty is to confer the shadow and withhold the substance of authority." The District Court was of the opinion that to limit the Secretary's right "to inspect books to cases in which he has already obtained information justifying a formal complaint against somebody defeats the purpose of the act;" and the Court remarked that "regulation of boards of trade as contract markets necessarily requires, as the basis for the exercise of the regulatory authority, information concerning the business, in the transaction of which the board is used as an instrument." On appeal this Court stated [65 F.2d 351] that the Fourth Amendment "cannot be applied to regulations which require reports and disclosures in respect to a business which is af-

[7] 154 U.S. 447, 474, 14 S.Ct. 1125, 1132, 38 L.Ed. 1047.
[8] 7 Cir., 65 F.2d 350, affirming the decision of the District Court in 56 F.2d 245.
[9] 7 U.S.C.A. §§ 1–17.

fected with a public interest, so far as such disclosures may be reasonably necessary for the due protection of the public." In support of the foregoing this Court quoted as follows from Board of Trade of Chicago v. Olsen:[10] "The Board of Trade conducts a business which is affected with a public interest and is, therefore, subject to reasonable regulation in the public interest."

■ That the phrase "affected with a public interest" is descriptive and not definitive or restrictive is made clear by the following statement of the Supreme Court in the Olsen case: "In view of the actual interstate dealings in cash sales of grain on the exchange, and the effect of the conduct of the sales of futures upon interstate commerce, we find no difficulty * * * in concluding that the Chicago Board of Trade is engaged in a business affected with a public national interest and is subject to national regulation as such." And in Nebbia v. New York [11] the Supreme Court declared that the phrase "affected with a public interest" can, in the nature of things, "mean no more than that an industry, for adequate reason, is subject to control for the public good."

■ But "an adequate reason" for national regulation exists if the activities of an industry substantially affect interstate commerce. This is made abundantly clear by the opinion of the Supreme Court in National Labor Relations Board v. Jones & Laughlin.[12] The Court relied upon decisions, which had upheld the power of Congress to regulate common carriers, as authority for holding that Congress had power to regulate labor relations of corporations engaged in manufacture. The factor common to the business of the common carrier and that of the manufacturer which supplied an analogy was the interstate character of the business of each. There is a national public interest in the protection of interstate commerce and Congress has plenary power to protect it "no matter what the source of the dangers which threaten it." [13]

The recent decision of the Supreme Court in Sunshine Anthracite Coal Co. v. Adkins, 60 S.Ct. 907, 912, 84 L.Ed. 1263,

May 20, 1940, upheld the power of Congress to create a scheme of price control of bituminous coal under the commerce clause of the Constitution. The Court declared that "the fixing of prices, the proscription of unfair trade practices, the establishing of marketing rules respecting such sales of bituminous çoal constitute regulations within the competence of Congress under the commerce clause." The Court further stated that "The commerce clause empowers [Congress] to undertake stabilization of an interstate industry through a process of price-fixing which safeguards the public interest by placing price control in the hands of its administrative representative." Elsewhere in its opinion the Supreme Court stated that "the problem of fixing reasonable prices for bituminous coal cannot be differentiated legally from the task of fixing rates under the Interstate Commerce Act."

■ When Congress, acting in the public interest, has the power to regulate and supervise the conduct of any particular business under the commerce clause, an administrative agency may be authorized to inspect books and records and to require disclosure of information regardless of whether the business is a public utility and regardless of whether there is any pre-existing probable cause for believing that there has been a violation of the law. Neither of the foregoing elements enters into the question of the reasonableness of the investigation.

Respondent earnestly contends that Federal Trade Commission v. American Tobacco Co., supra note 5, requires a different view to be taken; and respondent stresses the following quotation from such case [264 U.S. 298, 44 S.Ct. 337, 68 L.Ed. 696, 32 A.L.R. 786]: "The mere facts of carrying on a commerce not confined within State lines and of being organized as a corporation do not make men's affairs public, as those of a railroad company now may be." In that case the Federal Trade Commission was seeking to compel production of papers by petitions for writs of mandamus. The Federal Trade Commission claimed "an unlimited right of access to the respondents' papers with reference to the possible existence of practices in vi-

---

[10] 262 U.S. 1, 43 S.Ct. 470, 478, 67 L. Ed. 839.

[11] 291 U.S. 502, 536, 54 S.Ct. 505, 515, 78 L.Ed. 940, 89 A.L.R. 1469.

[12] 301 U.S. 1, 37, 38, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

[13] Second Employers' Liability Cases, 223 U.S. 1, 32 S.Ct. 169, 176, 56 L.Ed. 327, 38 L.R.A.,N.S., 44.

olation of section 5 [15 U.S.C.A. § 45, unfair methods of competition in commerce]." As further evidence of what the petitioner claimed the Court stated that it was "contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." But the Supreme Court placed its own limitation on its decision by the distinction which it made between the case before it and a case cited by the petitioner. The Court stated that "in the state case relied on by the Government, the requirement was only to produce books and papers that were relevant to the inquiry." The decision is limited to the proposition that the United States Government may demand only records and papers which are relevant to a lawful inquiry, or stated negatively, the Government may not demand unlimited access to all the corporation records, whether relevant or irrelevant to the subject of inquiry or investigation.

We are unable to find the significance found by respondent in the quotation relied upon by it as indicating a special restriction on the power to require production of books and papers by a private corporation, as distinguished from a public carrier. It is undoubtedly true that, for purposes of regulation, the affairs of a railroad company are more public than the affairs of a private corporation. As already suggested in this opinion, the power of Congress to regulate railroad companies is based upon the commerce clause; but when Congress exercises the power to regulate railroad companies which are engaged in interstate commerce, the scope of potential regulation is enlarged by the fact that railroad companies are public utilities. In the case of private corporations that are not engaged in the business of a public utility the scope of the regulatory power of Congress is limited by the requirement that the purposes and effects of the regulation must bear some relation to interstate commerce. Since the valid scope of regulation of a railroad company, as an interstate public carrier, is necessarily extremely broad, the scope of the incidental power of·inspection is correspondingly broad. But in the case of a private corporation which is subject to regulation by Congress only for the protection of interstate commerce, the potential scope of valid regulation is not as great as in the case of a public carrier engaged

in interstate commerce; and the scope of inspection of books and records will be correspondingly limited. In view of the broad power of regulation of interstate public carriers, it is difficult to conceive of a case in which the Interstate Commerce Commission would be seeking to inspect a record or document which would not be relevant to a lawful activity of the Commission. We assume, however, that if such a case were presented, the right to require production of a record or document would be denied.

We conclude that when Congress, in the exercise of its plenary power of regulation under the commerce clause, creates an administrative agency with power to regulate and supervise the acts and practices of an industry in order to safeguard commerce, and requires records to be kept to have available to the agency information respecting specified subjects, and requires the agency to enforce the requirement to keep such records, such administrative agency is entitled to inspect the records at any time to obtain the information and for the further purpose of determining whether or not such records are being kept, and whether or not they are being kept in such a way as to make available the specified information.

■ The decisions afford ample authority for the order of production in the instant case, which covered certain specified and particularized records covering a stated period of time and containing wage and hour information. The wage and hour information is relevant to an investigation of respondent's acts and practices regarding hours of employment, wages paid, classification of employees, and discriminatory acts, all of which subjects of investigation are matters controlled and regulated by the Act. Since respondent is subject to the Act, the investigation is a lawful inquiry. In the instant case the demand was suitably made by a duly constituted authority; and the demand "was expressed in lawful process, confining its requirements to certain described documents and papers easily distinguished and clearly described." [14] The order requires production of records which will enable the Administrator to determine hours actually worked by the employees in a single mail order house, the hours scheduled for each department for such house, and the wages actually paid the employees,

[14] Essgee Co. v. United States, supra Note 6.

the disclosure of such information being restricted to a limited period of time.

■ We are of the opinion that the subpœna duces tecum is not invalidated by the absence of a showing that certain of the records called for are described in detail by the Act, or by regulations, as records which respondent is required to keep. Respondent is required by the Act and regulations to have the information available in some form to be determined by the respondent. That is sufficient. Furthermore, it is not denied that the records do exist and it is clear that they are relevant to the inquiry.

■ Respondent urges that since there are sources of information other than its records, for example, the employees, petitioner should exhaust such other sources before seeking to obtain the information from respondent. But it is evident that the information sought from the records, and to which respondent is entitled, is not within the knowledge of employees generally. Respondent is the sole source of information as to whether it has complied with Sections 11(c) and 15(a) (5) by keeping records and by keeping them in such a way as to make available the information which such records are assumed to contain. Furthermore, there is no lawful restraint upon the use of the subpœna duces tecum which limits its use to cases where the subpœnaed property is the sole source of the information. And there is substantial merit in the administrator's statement that "to require the Administrator to seek 2000 sources (employees) for some of the information which the Act specifically provides shall be made available to him by the employer would nullify the enforcement of the Act."

■ Respondent urges, as was urged upon this Court in Bartlett Frazier Co. v. Hyde, supra, that compliance with the subpœna would impose on it "an exceedingly onerous burden." This Court rejected the contention with the comment that it was "too trivial to merit serious consideration when weighed against the wise public policy manifested by the act." We think the foregoing language is applicable to the present contention.

■ Respondent insists that the subpœna was unreasonable because the records required would include records of employees not entitled to the benefits of the Act. In the course of the administration of the Act the Administrator will have to determine in many particular cases whether the employee is covered by the Act; there will be difficulty in making the proper classification of employees under the exceptions of Section 13(a) (1). And the Act provides that the exemption in Sec. 13(a) (1) of bona fide "executive", "administrative", "professional", or "local retailing" employees is subject to the provisions of the Act "as such terms are defined and delimited by regulations of the Administrator." Petitioner is not required to accept respondent's classification of employees; and, in fact, the necessary conclusions seem to be that petitioner, in making the investigation "to determine whether any person has violated any provision of (the) Act, or which may aid in the enforcement of the provisions of (the) Act" must determine for himself, in the first instance, whether an employee of an employer subject to the Act is one entitled to the Act's benefits and whether he has received those benefits. It would be impossible for the Administrator to discharge his duties under the Act without full information respecting the wages and hours of employees and the nature of their duties, regardless of whether particular employees are exempt from the provisions of the Act. As pointed out above, the exemption of Section 13(a) (1) applies to the enumerated classes of employees "as such terms are defined and delimited by regulations of the Administrator." To make proper and effective regulations the Administrator is entitled to full information respecting the character and basis of voluntary classifications by the employer. Such information may suggest to the Administrator the necessity of further legislation in order to enable the Administrator to make effective regulations.

We are of the opinion that to limit the scope of the subpœna duces tecum to records of employees who have been classified as non-exempt by the employer would deprive the Administrator of information necessary for the proper performance of his duties under the Act and seriously interfere with the effectuation of the purposes of the Act.

The order of the District Court is affirmed.