**FEDERAL TRADE COMMISSION,**
**Petitioner-Appellant,**

v.

**Glenn W. TURNER,**
**Respondent-Appellee.**

No. 78–2932.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1980.

Rehearing and Rehearing En Banc
Denied March 13, 1980.

Denis E. Hynes, W. Dennis Cross, Gerald P. Norton, Federal Trade Commission, Washington, D. C., for petitioner-appellant.

Nichols & Tatich, Philip Tatich, Orlando, Fla., for respondent-appellee.

Before BROWN, CHARLES CLARK and VANCE, Circuit Judges.

---

VANCE, Circuit Judge:

This case raises the question of the power of the Federal Trade Commission (F.T.C.) to use an investigational subpoena to ascertain whether the subject of a cease and desist order has sufficient financial resources to make worthwhile a civil damage action for consumer redress. We hold that the F.T.C.'s otherwise broad investigatory powers do not extend far enough to justify our enforcing such an investigational subpoena.

On November 18, 1975, the F.T.C. issued a cease and desist order against Glenn W. Turner and others. *Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975), *aff'd sub nom. Turner v. F.T.C.*, 188 U.S.App.D.C. 438, 580 F.2d 701 (D.C.Cir.1978). On May 17, 1977,[1] the F.T.C. authorized the use of compulsory processes to obtain information as to the "availability of assets from which injury to consumers or others may be redressed." The F.T.C. acknowledges that this information was to be used in deciding whether to bring a civil action against Turner and other persons, pursuant to § 19(a)(2) of the Federal Trade Commission Improvement Act, 15 U.S.C. § 57b(a)(2) (the Act).[2] In the course of its investigations, the F.T.C. issued a subpoena duces tecum to Turner directing him to produce various documents disclosing the state of his and his family's finances. Turner moved to quash the subpoena arguing that the F.T.C.'s demand constituted impermissible pretrial discovery and exceeded the scope of the F.T.C.'s investigational authority. The F.T.C. rejected Turner's contentions and denied his motion. Turner then informed the F.T.C. that he refused to furnish the subpoenaed information.

On April 14, 1978, the F.T.C. petitioned the district court for an order requiring Turner to comply with the investigative subpoena. The district court denied the petition, holding that the Act did not grant the F.T.C. authority "to inquire into a subject's wealth prior to instituting a civil damage action against him." The F.T.C. then appealed to this court.

The Federal Trade Commission Act, 15 U.S.C. §§ 41–46, 47–58, gives the F.T.C. broad investigatory powers to promote fair trade practices. Under 15 U.S.C. § 46(a), it has explicit authority "To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person . . . engaged in or whose business affects commerce." To facilitate such investigations, 15 U.S.C. § 49 empowers the F.T.C. "to require by subpoena the attendance and testimony of witnesses and the production of all documentary evidence relating to any matter under investigation." The F.T.C. may obtain the information it seeks as long as "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950). *See e. g., Genuine Parts Co. v. F.T.C.*, 445 F.2d 1382, 1391 (5th Cir. 1971); *F.T.C. v. Texaco, Inc.*, 180 U.S.App.D.C. 390, 400, 555 F.2d 862, 872 (D.C.Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); *Midwest Growers Cooperative Corp. v. Kirkemo*, 533 F.2d 455, 461 (9th Cir. 1976).

To fulfill its public responsibility of preventing unfair commercial practices, the F.T.C. must institute proceedings, issue orders, and insure compliance with its decrees. *United States v. Morton Salt Co.*, 338 U.S. at 640, 70 S.Ct. 357; 15 U.S.C. § 45. In order to carry out these duties, Congress

---

1. The cease and desist order did not become final until October 5, 1978. Our disposition of this case makes it unnecessary for us to examine the F.T.C.'s authority to commence an investigation in contemplation of civil action before the cease and desist order became final.

2. Section 19(a)(2) of the Act, 15 U.S.C. § 57b(a)(2), empowers the F.T.C. to institute a civil action against any person who "engages in any unfair or deceptive act or practice . . . with respect to which the Commission has issued a final cease and desist order which is applicable to such person." *See generally, F.T.C. v. Glenn W. Turner Enterprises, Inc.*, 446 F.Supp. 1113 (M.D.Fla.1978).

has given the F.T.C. the authority to conduct investigations to determine whether the law is being violated:

> Even if one were to regard the request for information . . . as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

*United States v. Morton Salt Co.,* 338 U.S. at 652, 70 S.Ct. at 369. Thus an investigation may be instituted to discover and to produce evidence on the basis of which charges may be brought in the F.T.C.'s discretion. *Genuine Parts Co. v. F.T.C.,* 445 F.2d at 1388 (quoting *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 201, 66 S.Ct. 494, 90 L.Ed. 614 (1946)).

 The F.T.C. errs, however, in failing to distinguish investigations seeking information concerning wrongs done consumers from investigations into the practicality of pursuing a remedy for those wrongs. The amount of Turner's assets is not relevant to an inquiry into whether a violation of the law exists.

 The relevance of an F.T.C. subpoena request is measured against the purpose and scope of its investigation. *F.T.C. v. Texaco, Inc.,* 555 F.2d at 874. The F.T.C. contends that Turner's wealth is germane because its investigation was instituted to determine the practical feasibility of a consumer redress action against Turner. The F.T.C., however, was not given the authority to conduct this sort of investigation before commencing a civil action for damages.

In bringing a consumer redress action for damages, a power recently conferred by 15 U.S.C. § 57b(a)(2), the F.T.C. assumes a different litigative posture than the one it occupies in performing its administrative and quasi-judicial functions. In cases brought under 15 U.S.C. § 57b(a)(2), the F.T.C. is a civil plaintiff seeking damages to redress the injuries of individual consumers rather than a watchdog protecting the general public from unfair trade practices. Absent a specific congressional mandate or a clearly discernible statutory implication, we will not find that the F.T.C. has the claimed investigative authority in its new role. No provision in 15 U.S.C. § 57b broadens the agency's investigatory authority to include an inquiry into a prospective defendant's assets for the purpose of determining the practical feasibility of instituting a damage action.

Information about the financial status of a putative defendant would be interesting to any person or agency considering a civil suit for damages. Under most circumstances, however, a private plaintiff may not discover an opponent's assets until after a judgment against the opponent has been rendered. *Sanderson v. Winner,* 507 F.2d 477, 479–80 (10th Cir. 1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975); *cf.* Fed.R.Civ.P. 69(a) (discovery in aid of judgment).[3] Turner's financial status, like the financial status of most putative defendants, is not relevant to any issue that will be raised in the contemplated lawsuit.

In determining another agency's right to judicial enforcement of a subpoena duces tecum issued pursuant to an investigation conducted under 15 U.S.C. §§ 49, 50, the Supreme Court explained,

> [T]he basic compromise has been worked out in a manner to secure the public interest and at the same time to guard the private ones affected against the only abuses from which protection rightfully may be claimed. The latter are not identical with those protected against invasion by actual search and seizure, nor are

---

**3.** Although the Federal Rules of Civil Procedure do not bind administrative agencies in conducting purely administrative investigations, *e. g., Bowles v. Bay of N.Y. Coal & Supply Corp.,* 152 F.2d 330, 331 (2d Cir. 1945) ("administrative subpoenas"), administrative agencies are unquestionably bound by the rules when they are parties in civil actions. 4 C. Wright and A. Miller, *Federal Practice and Procedure* § 1027, at 118–19 (1969). *E. g., EEOC v. D. H. Holmes Co.,* 556 F.2d 787, 792 (5th Cir. 1977), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978); *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 951–52 (9th Cir. 1976). *See generally* Fed.R.Civ.P. 4, 12(a), 55(e).

the threatened abuses the same. They are rather the interests of men to be free from officious intermeddling, whether because irrelevant to any lawful purpose or because unauthorized by law, concerning matters which on proper occasion and within lawfully conferred authority of broad limits are subject to public examination in the public interest. *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. at 213, 66 S.Ct. at 508. Because the subpoenaed information in this case is not reasonably relevant to any authorized F.T.C. inquiry, the public need for this information does not justify the pretrial invasion of Turner's privacy. We therefore affirm the district court's decision not to enforce the subpoena.

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting:

Today, in a seemingly simple and straightforward opinion, this Court truncates the authority of the Federal Trade Commission to inquire into the assets of a prospective defendant in a consumer redress action. In so doing, this Court misreads the recently enacted Federal Trade Commission Improvements Act and denies the Commission a vital and meaningful method of successfully, faithfully serving the public interest.

In this case, the Commission sought to make an informed and intelligent decision as to whether to prosecute a civil action for consumer redress against Glenn Turner. Turner had already been found in violation of § 5 of the FTC Act, 15 U.S.C.A. § 45(b), and was subject to a cease and desist order. In a subsequent proceeding, now the matter before us, the Commission subpoenaed Turner to ascertain his financial resources. This information was sought to obtain material relevant to the appropriateness of the Commission commencing a civil action for consumer redress against Turner including, particularly, information as to the availability of assets from which consumer injury might be redressed.[1] When Turner refused to comply with the subpoena, the Commission sought to enforce it. The District Court and, now, this Court refused enforcement.

While the Court concedes the statutory mandate of the Commission to ferret out improper business practices and its broad investigatory power, the Court seems to make two basic points which persuade it to rule otherwise. First, the Court says that the information sought is not reasonably relevant to the purpose of the proceeding. Second, in almost the same breath, the Court says that the agency lacks sufficient statutory authority for its demand. As evidence for one or perhaps both of these points the Court characterizes the litigative posture of the Commission as merely akin to an individual plaintiff rather than a consumer watchdog. The Court also observes that a private plaintiff could not discover the assets of a putative defendant under the Federal Rules of Civil Procedure. The Court then concludes with an emotive plea for individual privacy over public investigation.

None of this legal fog masks the closeness of this issue. And, because I view the statutory and judicial framework, the recent amendments embodied in the Federal Trade Commission Improvements Act, and the legislative history of these amendments, to grant the Commission this investigatory authority, because I reject this Court's analogies to the Federal discovery rules, and because I find these facts particularly appropriate, I would enforce the subpoena.

---

[1]. As the Commission explained in its order directing compulsory processes of May 17, 1977, the nature and scope of the investigation was to obtain information from Turner and the other persons and corporations named in the cease and desist order, and others, "relevant to the appropriateness of the Commission commencing a civil action to obtain consumer redress" pursuant to § 19 of the FTC Act against such persons and corporations, "including, but not limited to obtaining information as to the availability of assets from which injury to consumers or others may be redressed."

*The Statutory And Judicial Framework*

(i) The Commission's Statutory Authority Before The FTC Improvements Act

Only by a careful examination of the statutory framework prior to the passage of the FTC Improvements Act, may the consumer redress provision be properly understood. The various provisions of Title 15 of the U.S. Code invest the Commission with broad authority to protect the public against business improprieties, specifically, to prevent persons, partnerships and corporations from using unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C.A. § 45(a)(2). To meet that duty the Commission may institute an administrative proceeding in the "public interest" and may order a party to cease and desist from any unlawful conduct. 15 U.S.C.A. § 45(b). Once such an order becomes final, the Commission may impose civil penalties for any violation of its order. 15 U.S.C.A. § 45(*l*).

To fulfill these functions the Commission, from its inception, has been given a broad, although not unlimited, power of investigation.[2] The Commission is authorized to "prosecute any inquiry necessary to its duties." 15 U.S.C.A. § 43. The Commission also has the power

> [t]o gather and compile information concerning, and to investigate from time to time the organization, business, conduct, or practices, and management of any corporation engaged in commerce . . . its relation to other corporations and to individuals, associations and partnerships.

15 U.S.C.A. § 46(a) (before 1975). In addition, the Commission may require such corporations to file reports or written answers to special questions regarding their organization, business and the like, all in such manner as the Commission may prescribe. 15 U.S.C.A. § 46(b). This information-gathering authority is augmented by the Commission's statutory right of access to and copying of any documentary evidence of such persons, partnerships or corporations. 15 U.S.C.A. § 49. The Commission is also empowered to require by subpoena the testimony of any witnesses and the production of all documentary evidence "relating to any matter under investigation." *Id.* The District Courts are afforded jurisdiction to enforce such subpoenas and, at the behest of the U.S. Attorney General, to issue writs of mandamus in order to enforce any order of the Commission under its statutory authority. *Id.*

Whenever it prosecutes an action, gathers information, orders the filing of reports, or issues and seeks to enforce subpoenas, the Commission acts not as a private litigant, but in the public interest. This public function is underscored by the Commission's own rules, effective before the amendments and equally effective today:

Policy As To Private Controversies

> The Commission acts only in the public interest and does not initiate an investigation or take other action when the alleged violation of law is merely a matter of private controversy and does not tend adversely to affect the public.

16 CFR § 2.3.

(ii) Judicial Expansion of Administrative Investigatory Authority

Besides the statutes, an eye must be cast to the expanding judicial interpretation of the Commission's investigatory authority. Recent years have seen a dramatic shift in judicial perception of the investigatory function of administrative agencies. Initially, the Courts were reticent to support the subpoena power of administrative agencies. In 1881, the Supreme Court held that the House of Representatives could not enforce the subpoena issued by a Congressional committee in the course of an investiga-

---

2. According to the commentators,

the FTC was originally designed to be an investigative body—to investigate business practices and provide information to the public and guidance to industry. In the words of President Wilson, the Commission was to be 'an indispensable instrument of information and publicity . . . a clearing house for the facts by which both the public mind and the managers of great business undertaking should be guided.' 51 Cong.Rec. 1963 (1914). Robinson & Gelhorn, The Administrative Process 386–87 (1974).

tion. *Kilbourn v. Thompson,* 1881, 103 U.S. (13 Otto) 168, 26 L.Ed. 377. The Court explained that neither House of Congress "possesses the general power of making inquiry into the private affairs of the citizen." 103 U.S. at 190. Similarly, in 1887, while striking a subpoena issued by a specially created commission, Mr. Justice Field opined, in language not unlike that of Glenn Turner and now echoed by this Court, "intrusion into, and compulsory exposure of, one's private affairs and papers, without judicial process, or in the course of judicial proceedings . . . is abhorrent to the instincts of Englishmen and Americans." *In re Pacific Railway Commission,* N.D.Cal., 1887, 32 F. 241, 251. The agencies were also prohibited from utilizing subpoenas to obtain information for determining regulatory policy, *Harriman v. ICC,* 1908, 211 U.S. 407, 419–20, 29 S.Ct. 115, 118, 53 L.Ed. 253, 263, conducting an investigation pursuant to a Senate resolution, *FTC v. American Tobacco Co.,* 1924, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, and obtaining documents bearing on possible securities law violations, *Jones v. SEC,* 1936, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015. Otherwise, "further pursuit of the inquiry, obviously, would become . . . 'a fishing expedition . . .' . . . which uniformly has met with judicial condemnation." 298 U.S. at 26, 56 S.Ct. at 662, 80 L.Ed. at 1026.

Finally, the Court decided the watershed case of *Oklahoma Press Publishing Co. v. Walling,* 1946, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, enforcing an investigatory subpoena and discrediting many preceding decisions restricting the subpoena power of the agencies. In *Oklahoma Press* the Court held that the issue of jurisdictional coverage under the Fair Labor Standards Act was up to the agency and not the Courts. The fundamental perspective espoused in *Oklahoma Press,* however, is even more remarkable. In direct conflict with earlier denials of "fishing expeditions," *Oklahoma Press* emphasized,

> The short answer to the Fourth Amendment objections is that the records in

these cases present no question of actual search or seizure, but raise only the question whether orders of court for the production of specified records have been validly made; and no sufficient showing appears to justify setting them aside. 327 U.S. at 195, 66 S.Ct. at 498, 90 L.Ed. at 622. Indeed,

> The very purpose of the subpoena . . is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's judgment, the facts thus discovered should justify doing so.

327 U.S. at 201, 66 S.Ct. at 501, 90 L.Ed. at 625.

Then the now famous three part test for enforcement of the administrative compulsory process— (1) statutory authority, (2) definiteness, and (3) relevance—was formulated in *United States v. Morton Salt,* 1950, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401, 415–16. In the words of the Court, " 'The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.' *Oklahoma Press Publishing Co. v. Walling,* 1946, 327 U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614." 338 U.S. at 652–53, 70 S.Ct. at 369, 94 L.Ed. at 416.[3] In that case the FTC sought to require certain corporations to file a report showing how they complied with an earlier Court of Appeals decree enforcing a Commission cease and desist order in addition to reports already required by the decree itself. When the corporations clammered "fishing expedition," the Court stated:

> We will assume for the argument that this is so. . . . We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. The courts could not go fishing, and so it followed neither could anyone else. . .

\* \* \* \* \* \*

---

3. See *supra* at p. 744.

Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

338 U.S. at 641–42, 652, 70 S.Ct. at 363, 369, 94 L.Ed. at 410, 416.[4] There can be no doubt that after *Oklahoma Press* and *Morton Salt,* administrative agencies may fully conduct investigations.[5]

### The Public Interest Reaffirmation Of The FTC Improvements Act

It is in this statutory and judicial framework that the Federal Trade Commission Improvements Act was enacted and must be analyzed. Today, this Court would have us believe that these amendments retracted the authority previously given to the Commission. According to this Court, the consumer redress amendments recast the Commission in a different litigative posture, from a quasi-judicial body to a mere civil plaintiff. After close study of the express language of the amendments and their legislative history, I cannot agree.

Rather, it is my view that the Improvements Act expanded the role of the Commission as a watchdog for consumers and a guardian of the public interest. This legislation, effective in 1975, contained two parts. Title I, entitled Consumer Product Warranties, established numerous consumer warranties regarding the sale of goods in amounts over $5. Title II, entitled FTC Improvements, with which we are specifically concerned, included several provisions to buttress the powers of the Commission itself. The jurisdictional reach of the Commission was broadened, Pub.L. 93–637 § 201, rulemaking authority granted, *id.* § 202, and the amounts of permissible civil fines raised. *Id.* § 205. Further, the Commission was allowed to represent itself in civil proceedings in Court. *Id.* § 204. And, the investigatory authority of the Commission was broadened to cover "persons" and "partnerships" as well as just "corporations." *Id.* § 203 (now 15 U.S.C.A. § 46(a)).

In addition, and what is most significant for our purposes, the Commission was authorized to commence actions for consumer redress at the violation of any Commission rule. *Id.* § 206 (now 15 U.S.C.A. § 57b(a)).

---

4. *Accord*:

[The Federal Trade Commission] 'has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'

*United States v. Powell,* 1964, 379 U.S. 48, 57, 85 S.Ct. 248, 255, 13 L.Ed.2d 112, 119.

Notably, the FTC Act, as discussed below, has been amended to broaden investigatory power from "corporations" alone to include also "partnerships" and, most importantly for this case, "persons." Thus, if *Morton Salt* authorized legitimate "official curiosity" nearly thirty years ago, under the broadened consumer redress and investigatory provisions of the FTC Improvements Act, administrative inquiries with an articulable, specific purpose should be even simpler to permit.

5. In the words of Kenneth Culp Davis,

What has happened, in broad perspective, is that regulatory agencies operating under such statutes have obtained essentially all the information they have sought from private parties. The barriers to reasonable investigation vanished through *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, (1946). Agencies now conduct investigations, including investigatory proceedings, to make rules, to determine policy, recommend legislation, and to eliminate areas that are dark to find out whether something should be done and if so, what.

K. C. Davis, Administrative Law Treatise § 4:4 at 234 (1979). Courts have consistently followed these principles. E. g., *FTC v. Gibson Products of San Antonio, Inc.,* 5 Cir., 1978, 569 F.2d 900, 909; *Genuine Parts Co. v. FTC,* 5 Cir., 1971, 445 F.2d 1382, 1391; *In re FTC Line of Business Reports,* D.C.Cir., 1978, 193 U.S.App. D.C. 300, 595 F.2d 685 *cert. denied,* 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978); *FTC v. Texaco, Inc.,* D.C.Cir., 180 U.S.App.D.C. 390, 400, 555 F.2d 862, 872 (en banc), *cert. denied,* 1977, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1972; *United States v. Litton Ind., Inc.,* 9 Cir., 1972, 462 F.2d 14, 16; *FTC v. Standard American, Inc.,* 3 Cir., 1962, 306 F.2d 231, 233–35; *Adams v. FTC,* 8 Cir., 296 F.2d 861, 866, *cert. denied,* 1861, 396 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 83.

Specifically, the Commission may bring a civil suit against any person, partnership or corporation that engages in any unfair or deceptive act or practice, when the Commission has issued a final cease and desist order against such person, partnership or corporation. Certain limitations are imposed such as a three-year statute of limitations. Yet, once the cease and desist order is final, Commission findings are conclusive unless either the terms of the order provide otherwise or the defendant did not seek judicial review of the order. And, notably, neither exception applies here.

The purpose of these amendments, as underscored by their legislative history, was to enable the Commission to serve better the public interest and protect consumers. The development of the consumer role of the Commission must initially be understood. Drafters of both the Senate and House trace the Commission's evolution as an increasingly effective consumer watchdog. S.Rep.No.143, 93d Cong., 1st Sess. 8–11 (1973); Hearings before the House Subcomm. on Commerce and Finance, No. 93–17, 93d Cong., 1st Sess. 58 (1973). In 1938 the Wheeler-Lea Trade Commission Act expanded the powers of the FTC to cover "unfair or deceptive acts or practices in commerce." S.Rep., *supra*, at 8. At that time the sole enforcement weapon was the cease and desist order and even then members of the House Committee decried the inadequacy of such limited powers of enforcement. Such regulatory anemia of the Commission was criticized over and again and the call for expansion of FTC authority repeated. *Id.* at 9.

The legislative hearings evince this very same concern over the prior limitation on the FTC, from which its drafters sought to substantially free the Commission. Early on the Chairman of the committee studying the legislation stated,

> with each day that passes, I, as the new Chairman, become increasingly convinced that the Commission cannot realize its full potential, particularly in the consumer protection area, until certain amendments are enacted. . . .

House Hearings, *supra,* at 58 (statement of Chairman Engman). In the words of Mr. Magnuson, one of the legislation's drafters, Title II was designed to "improve the Federal Trade Commission's ability to serve as a viable consumer protection agency. . . A mere cease-and-desist order has frequently let a wrongdoer keep his ill-gotten gains." 119 Cong.Rec. 29,480 (daily ed. Nov. 12, 1973). And, as the House Report explained, despite the 1938 amendments, the FTC was still "hampered as an effective force in promoting free and fair competition in safeguarding the consuming public . . . .." H.Rep.No.93–1107, 93d Cong., 2d Sess. 29 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7702, 7712.

Then, studies of the Commission underscored the need for added authority to the agency to carry out its consumer protection role. H.Rep., *supra,* at 33–34. In particular, a landmark ABA special commission under the chairmanship of W. Kirkpatrick, then chairman of the ABA's section on antitrust law, was completed, concluding that "effective law enforcement . . . requires creation of new procedural devices. . . ." *Id.* at 10.

With this clear call for greater Commission enforcement authority, the FTC Act was amended. According to a Senate report, one of the purposes of the bill was "to amend the Federal Trade Commission Act in order to improve consumer protection activities," S.Rep.No.93–151, 93d Cong., 1st Sess. 1 (1973), and, specifically,

> to improve the position of the consumer in the marketplace by making the Federal agency responsible for his economic wellbeing (the F.T.C.) more effective. . . .

*Id.* at 2. Similarly, the House report noted that one purpose of the legislation was to provide the Commission with the "means of better protecting consumers." H.Rep., *supra,* at 20. Indeed, the House report explains three of the four amendments as expansive, broadening, burgeoning grants of authority: jurisdiction was "expanded," investigatory power was "broadened," and rulemaking authority was "clarified and

confirmed." *Id.* at 21. And, like consumerism fervor was expressed in Congressional debates: "The consumer redress provision in the bill is of great significance and demonstrates a firm commitment on the part of Congress to make Federal regulatory agencies directly responsive to the needs of the American consumer." 120 Cong.Rec. 31,-314, at 40,711 (Mr. Moss).

One of the more revealing statements may be one summary of the purposes of the consumer redress provision. A Senate report explained the intent of the provision as "remedial," to reinforce the policing power of the Commission. Moreover, and, what may be more important for our purposes, the purpose of the consumer redress provision was

> to enable the Commission, where its investigation of an act or practice revealed damage to consumers, to utilize the results of that investigation for the benefit of the damaged parties.

S.Rep.No.93–151, 93d Cong., 1st Sess. 28 (1973). Here, the Commission seeks to use the results of its investigation "for the benefit of the damaged parties." But in order to do so, the Commission must be able to determine whether there exists any financial "benefit" to consumers.

In the face of this permissive statutory framework and the clear import of the legislative history to add to, rather than change, the authority of the Commission, it seems clear that Congress intended to cast the Commission in a role not of a private litigant but a merely better equipped public protector. This Court's attempt to do otherwise, particularly on such thin analysis, should not be followed.

This Court also reasons that Commission authority for investigation into a prospective defendant's assets cannot be found absent a specific Congressional mandate. In my view, this Court reads the requirement of a statutory mandate too narrowly, and in conflict with the principles of *Morton Salt.* See *Serr v. Sullivan,* E.D.Pa., 1967, 270 F.Supp. 544, 546, *aff'd,* 3 Cir., 1968, 390 F.2d 619 (so long as some investigatory power is granted, further authority permitted "ei-

ther expressly or by necessary implication"); *Fleming v. Montgomery Ward & Co.,* 7 Cir., 114 F.2d 384, *cert. denied,* 1940, 311 U.S. 690, 61 S.Ct. 71, 85 L.Ed. 446 (subpoena *duces tecum* enforced under Fair Labor Standards Act of 1938 where statute granted investigatory authority and required records to be kept despite absence of showing that records sought were specifically described in statute).

In *Morton Salt,* respondent-corporations attempted to divorce the power to investigate afforded by § 6 of the FTC Act from the power to check unfair methods of competition afforded by § 5. The Supreme Court squarely rejected this argument. Instead, the Court stressed that the FTC Act must be read not as isolated statutory grants of authority, but as an "integrated whole." 338 U.S. at 650–51, 70 S.Ct. at 367, 368, 94 L.Ed. at 415. The Court also highlighted that a failure to use or recognize a power does not nullify its existence. 338 U.S. at 647–48, 70 S.Ct. at 366, 94 L.Ed. at 413. Following *Morton Salt,* this Court quite rightly examines the precise statutory provisions on which the Commission relies. But the Court must read these provisions as a unit: the power to seek a cease and desist order with the power to institute a consumer redress action, the authority to investigate private persons with the power to enforce subpoenas in the instance of noncompliance—all keeping the indications of Congressional intent to strengthen FTC authority clearly in mind.

This Court also ignores the Commission's own interpretation of its statutory authority, to which we have repeatedly given great deference in the past. See, e. g., *FTC v. Colgate-Palmolive Co.,* 1965, 380 U.S. 374, 385, 85 S.Ct. 1035, 1043, 13 L.Ed.2d 904, 914 ("This Court has frequently stated that the Commission's judgment is to be given great weight by reviewing courts."); *Red Lion Broadcasting Co. v. FCC,* 1969, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. . . .").

Further, while no cases have expressly held what the Commission suggests we hold today, there have been several suggestions in recent decisions to support the Commission's view. In holding that only the Commission and not the Court of Appeals may decide whether to postpone the operation of a valid cease and desist order of the Commission, the Supreme Court explained,

> [T]he Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically.

*Moog Industries v. FTC,* 1958, 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370, 373. *Accord FTC v. Universal-Rundle Corp.,* 1967, 387 U.S. 244, 251, 87 S.Ct. 1622, 1626, 18 L.Ed.2d 749, 755 (Court of Appeals exceeded its authority in postponing FTC cease and desist order). The Ninth Circuit has also stressed that the Commission is vested with considerable discretion in targeting its enforcement efforts. *State of Cal. ex rel. Christensen v. FTC,* 9 Cir., 1977, 549 F.2d 1321, 1323–24 n. 2 (in holding a failure to exhaust remedies, the Court stated, "Obviously, Congress has empowered the FTC to decide which actions are worthy of its attention. . . ."). The District of Columbia Circuit has commented similarly in *In re FTC Line of Business Reports,* 1978, 1978–2, 193 U.S.App.D.C. 300, 595 F.2d 685 *cert. denied,* 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978). See also *Electronic Computer Programming Institute, Inc.,* 1975, 86 FTC 1093, 1096–97 (suggesting that the Commission may determine the feasibility of enforcement, although the Commission did not in this case where delay would result and an alternative method of obtaining the information was available); *Brennan v. Lord and Taylor, Inc.,* D.N.J., 1971, 34 Ad.L.2d (P&F) 957, 958 (pre-suit discovery of employer's personnel records showing sales productivity permitted: "As a practical matter, the production of this information now could conceivably forestall and prevent such proceedings from ever being instituted and spare both the court and the parties herein the time and expense necessarily attendant to the prosecution of a civil proceeding."). And, the Second Circuit, in *United States v. Kulukindis,* 2 Cir., 1964, 329 F.2d 197 (Friendly, J.) held that an administrative agency was entitled to enforce an administrative subpoena regarding back taxes even though a civil action for damages had not yet been reduced to judgment. The Court rejected appellant's contention that the subpoena should not be enforced before civil liability was determined. The Court explained in part that by the time a judgment was obtained, assets might be secreted or removed. Equally important, with instructive import to our case, was the fact that the information sought "might lead the Government to abandon the civil suit . . . ." *Id.* at 199.

### Guidance From The Federal Rules?

Rather than even mentioning these enforcement cases, the Court chooses to follow the dictates of F.R.Civ.P. 69(a), which authorizes only post-judgment asset investigation, and a single decision out of the Tenth Circuit. First, the Federal Rules are not binding on administrative agencies. *Bowles v. Bay of N.Y. Coal and Supply Corp.,* 2 Cir., 1945, 152 F.2d 330. Moreover, when faced with a problem similar to ours, the Second Circuit, unlike this Court today, ruled that F.R.Civ.P. 69(a) had no bearing on the power of an administrative agency to obtain, by investigative subpoena, information on financial resources. *United States v. Kulukundis, supra.* And, in *Brennan v. Lord and Taylor, Inc., supra,* the District Court of New Jersey refused to limit the discovery of the EEOC to that afforded under the Federal Rules. Since the FTC has considerably broader authority than the EEOC,[6] that Court's result should be even more persuasive to us.

---

**6.** For example, the EEOC is only empowered to seek relief by filing a proceeding in the District Court, whereas the FTC may institute its own actions for a cease and desist order, 15 U.S.C.A. § 45(b), and consumer redress damages, 15 U.S.C.A. § 57b.

Second, the case on which the Court relies—*Sanderson v. Winner*, 10 Cir., 507 F.2d 477, *cert. denied*, 1974, 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780—arises in a different context. That case involved pre-judgment discovery in a *class action* pursuant to *F.R. Civ.P. 23*. I do not contest the analogy, for it does have some appeal. A class action is designed to facilitate the amalgamation and redress of individuals who otherwise would be unable to bring suit. See 3B Moore's Federal Practice ¶ 23.02[1]. By the same token, as I have already discussed, the purpose of the consumer redress provision was to enable the Commission to proceed in the public interest to redress injury to individual consumers. And, like proper class representatives, the Commission operates to benefit the public at large rather than one or two persons. At least one drafter of the Commission's consumer redress legislation noted the class action analogy, praising the provision since it provided an "answer" to problems indigenous to the class action device. 120 Cong.Rec. 41407 (daily ed. Dec. 19, 1974) (Mr. Broyhill).

However, a single citation to the *Sanderson* case does not provide a full treatment of the arguably analogous case law. Rather, several Courts, in the class action context, have squarely *permitted* pre-judgment discovery of a party's financial assets. E. g., *Klein v. Miller*, N.D.Tex., 1978, 82 F.R.D. 6; *P.D.Q. Inc. of Miami v. Nissan Motor Corp. in U.S.A.*, S.D.Fla., 1973, 61 F.R.D. 372; *Ralston v. Volkswagenwerk, A. G.*, W.D.Mo., 1973, 61 F.R.D. 427. See Note, Discovery of Plaintiff's Financial Situation in Federal Class Actions: Heading 'em off at the Passbook, 30 Hastings L.J. 449 (1978). Indeed, one commentator has embraced a more realistic approach to pre-judgment asset discovery—"If Rule 23 is to be used effectively for enforcing federal policy, the economic realities of acting as class plaintiffs' counsel must be recognized." Note, Class Certification: Relevance of Plaintiff's Finances & Fee Arrangements with Counsel, 40 U.Pitt.L.Rev. 70, 81 (1978). At the very least, the issue decided in *Sanderson* and which we confront is not as cut and dried as the Court suggests.

### The Public—Private Balance Tips Toward The Commission

As this Court suggests, a final consideration must be the proper balance between the need to secure the public interest and the need to protect private individuals from undue intrusions. To properly calibrate this balance, the Commission must turn to the Courts to enforce any subpoenas deemed meddlesome by private parties. The Courts must then apply established standards to test subpoena enforceability. However, as the Supreme Court has noted,

"[t]hat the power may be abused, is not ground for denying its existence. It is a limited power, and should be kept within its proper bounds; and, when these are exceeded, a jurisdictional question is presented which is cognizable in the courts." *McGrain v. Daugherty*, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1 (1927), quoting *People ex rel. McDonald v. Keller*, 99 N.Y. 463, 482, 2 N.E. 615 (1885).

*United States v. Bisceglia*, 1975, 420 U.S. 141, 151, 95 S.Ct. 915, 921, 43 L.Ed.2d 88, 96. In *Bisceglia*, the Supreme Court enforced a "John Doe" summons to a depository to discover the identity of a person possibly liable for unpaid taxes due to bank transactions. The subpoena power of the Commission in this case, also subject to these judicial enforcement limitations, is equally protected against the possibility of abuse.

Moreover, in my view, the precise circumstances of the case before us, speak to the absence of abuse of investigatory power. For, Glenn Turner is no newcomer to the administrative or judicial processes. He has been determined to be the alter ego of Koscot Company which in turn was held to have extracted over $44 million from consumers, much of it through misrepresentations. *Koscot Interplanetary, Inc.*, 1975, 86 FTC 1106, *enforced sub nom. Turner v. FTC*, D.C.Cir., 1975, 188 U.S.App.D.C. 438, 580 F.2d 701. Pursuant to § 5 of the FTC Act, a cease and desist order has been entered against Turner. At the possibility of a consumer redress action being brought

against him, he claimed himself bereft of assets to satisfy any judgment that could be obtained against him. See letter to Turner's counsel (Nov. 21, 1977) (denying Turner's motion to limit or quash the subpoena). In this context, I am hard put to accord much credence or seriousness to his protest and am afraid that my brethren lose sight of these considerations in deciding as they do.

All of this is not to say that the Commission should be given a license to investigate whenever it raises the banner of "public interest." Nor should the Commission be permitted to issue pro forma subpoenas into financial resources of a prospective defendant in a consumer redress action, particularly if the Commission already had access to the information and issued the subpoena for the purposes of private harassment rather than public benefit. Such limitations, sensitive to both private and public considerations, might be developed with time. However, for the present, in light of the statutory framework of the FTC Act, the dramatic judicial expansion of the Commission's investigatory authority, the consumer-oriented amendments to the Act and their legislative history, and the special circumstances here regarding Turner's proclaimed paucity of assets, I would enforce the subpoena.