Richard H. RALSTON et al., Plaintiffs,

v.

VOLKSWAGENWERK, A. G., et al., Defendants.

No. 18763-2.

United States District Court, W. D. Missouri, W. D.

Aug. 23, 1973.

Warren E. Slagle, Roger C. Bern, Kansas City, Mo., for plaintiffs.

Harry P. Thomson, Jr., Kansas City, Mo., Malcolm A. Hoffmann, Cecelia H. Goetz, New York City, for Volkswagenwerk, A. G. and Volkswagen of America, Inc.

Dick H. Woods, Kansas City, Mo., for Angle Motor Co.

William H. Sanders, Kansas City, Mo., for Art Bunker Volkswagen.

Bernard D. Craig, Jr., Kansas City, Mo., for Blue Ridge Volkswagen.

James S. Cottingham, Independence, Mo., for McIntosh Motors, Inc.

Frank Brockus, Kansas City, Mo., for Lockwood Motors, Inc.

Martin J. Purcell, Kansas City, Mo., for Merriam Motors, Inc.

Carl E. Enggas, Kansas City, Mo., for Volkswagen Mid America, Inc.

## MEMORANDUM RE CLASS ACTION ISSUES

URBOM, District Judge.

The named plaintiffs, Richard H. Ralston, Nancy Jeanne Ralston, and Patrick D. McAnany, have alleged violations by the defendants of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, the third amended complaint alleges that the multiple corporate defendants, consisting of the manufacturer, the importer, a regional distributor, and dealers of new Volkswagen automobiles, entered into a conspiracy to maintain the price of new Volkswagen vehicles at an artificially inflated level by agreements to eliminate price competition whereby the dealers were forbidden from deviating from the manufacturer's suggested retail price in the sale of new Volkswagen vehicles.

The named plaintiffs press a request that the action be declared a class action under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

Evidence consuming nine days has been tendered by the named plaintiffs in support of their class action request. I deny the request that the action proceed as a class action, because the named plaintiffs have not sustained their burden of proving that the requirements of Rule 23 have been met.

The provisions of Rule 23 which are pertinent to this memorandum state:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D)

the difficulties likely to be encountered in the management of a class action."

## TYPICALITY OF THE CLAIMS

The plaintiffs' third amended complaint, judge's filing No. 58, alleges that "the class consists of all persons who have purchased new Volkswagen vehicles from authorized Volkswagen dealers in the United States in the period in suit." Paragraph number 14 of the complaint alleges fraudulent concealment of the conspiracy alleged in the complaint, thereby, if proven, tolling the statute of limitations. Thus, the potential class as alleged by the plaintiffs would consist of every new Volkswagen purchaser in the United States. Discovery touching the class action issues has been limited tentatively by the court to a putative class consisting only of new Volkswagen purchasers in the greater Kansas City area during the period October 19, 1966, to October 19, 1970, numbering about 18,000. The class as alleged in the plaintiffs' third amended complaint could include, it has been said by counsel, as many as 4.5 million persons.

The plaintiffs' evidence regarding the similarity of the claims of potential members of the class consisted primarily of the testimony of Dr. Phil H. Taylor, Jr., an associate professor of quantitative management science at the University of Arkansas. In support of the named plaintiffs' claim that their claims are typical of the claims of other potential plaintiffs' claims, Dr. Taylor presented a statistical analysis of the sales of new Volkswagens by dealer and by year in the greater Kansas City area during the period 1966 to 1970. Dr. Taylor's analysis was based on plaintiffs' exhibits 3 through 8, which are summaries of new car sales, including discounts and overallowances, taken from the greater Kansas City area dealers' ledgers and new car sales journals.

The court notes parenthetically that cross-examination of Steven Volek, who prepared exhibits 3 through 8, showed that there were a number of errors in those exhibits. Although the errors may make a slight difference in the ultimate result of Dr. Taylor's calculations, they do not affect the substance of the method which he used to arrive at his conclusions.

Dr. Taylor's method may be summarized as follows: He determined the ratio of discounts and overallowances as shown by various dealers' entries in their ledgers and new car sales journals to the total dollar volume of Volkswagen sales in the greater Kansas City area during the period 1966 to 1970. The computation was made both as to individual dealers and for individual years. According to Dr. Taylor's analysis, his computations showed both that there was a striking similarity in profit and discount patterns among the six greater Kansas City area dealers and that there was a low percentage of discount dollars to overall sales dollars. The summaries prepared by Dr. Taylor are expressed in a ratio of dollars to dollars—that is, the percentage of total dollar sales volume represented in either direct dealer discounts or overallowances on used car trade-ins. According to the standard Volkswagen accounting procedure, discounts and overallowances are entered in a numbered account which appears on the dealer's monthly summary sheet. Accepting the validity of Dr. Taylor's analysis, I think the most that is shown is that the average buyers of new Volkswagens were treated similarly by the average dealer. His analysis does not show the number of average buyers. That is, it may be assumed that through Dr. Taylor's technique it can be shown that the average price of new Volkswagens of a particular model in the greater Kansas City area was within a very narrow price range for each dealer. What is not shown is precisely what figures caused that narrow range to occur. For example, it could be that a great number of new Volkswagen pur-

chasers were given small discounts; conversely, it is possible that a very few Volkswagen purchasers were given very large discounts. There is simply nothing in the record which provides an answer either way. The difficulty that arises from this shortcoming in the plaintiffs' evidence is that the court is unable to tell whether any or how many new Volkswagen sales in the Kansas City area were the same or substantially similar to the sales made to the named plaintiffs. The approach of the named plaintiffs is that because "average" buyers were treated the same by each dealer, the claim of each buyer—average or not—is so similar that the named plaintiffs' claims are typical of all buyers' claims. This conclusion simply does not follow from the premise.

Nor are the shortcomings in Dr. Taylor's analysis cured by plaintiffs' exhibits 3 through 8. These documents are summaries of ledgers and new vehicle sales journals kept by the six dealer defendants.

Each transaction at the retail level, according to the evidence, was assigned an account number which identified the transaction by type. For example, the sale of a Type 113/7 new Volkswagen should have been entered in account No. 4101. The entry would show the dealer's established list price, freight and handling charges, factory installed accessories and pre-service and delivery charges, if any. If an allowance over the actual cash value of the buyer's trade-in or a reduction from the dealer's established new vehicle list price was granted to the retail customer, an entry should have been made in account No. 4102. Exhibits 3 through 8, then, consist of month-by-month and annual summaries of activity in the various dealers' accounts. Discounts or overallowances would be reflected in the even-numbered 4100 series accounts. Illustrative of the summaries is exhibit 8, a summary of the sales activity for Merriam .Motors during the years 1966 to 1970. Selecting one year's activity for accounts 4101 and 4102, exhibit 8 indicates that Merriam Motors sold 708 Type 113/7 new Volkswagens in 1969 for which an entry was made in the 4101 account. During that time no entries appeared in the 4102 account. Although there was evidence to indicate that new car sales invoices may reflect discounts which did not appear in the ledger or new vehicle sales journals, for purposes of illustration it may be assumed that the 4102 account would reflect discount or overallowance activity if any occurred. Difficulty arises in two respects: First, there is no evidence to indicate that the dealers uniformly or individually followed the "standard" procedures set forth in the Volkswagen dealers' accounting and management procedures manual; second, difficulty arises around the question of which price or which portion of the total sales price is to be used to determine whether all members of the purported class were treated similarly.

For example, the summary for Merriam Motors for the year 1969 shows that 708 units of Type 113/7 new Volkswagen vehicles were sold at a total gross price of $1,298,865.45. This would indicate an average price per unit of $1,834.55. However, nothing in the evidence implies what portion of the total price for each unit sold constitutes the various components of pricing that go into the 4101 account. There is no indication before the court of how many, if any, transactions occurred at or near the "average" price of Type 113/7 new Volkswagens sold by Merriam Motors during the year 1969. It is further impossible to identify which price is the price which the plaintiffs allege in their complaint has been conspiratorily fixed by the various defendants. The most that is shown by exhibit 8 is that 708 transactions involving Type 113/7 new Volkswagen vehicles appeared in account 4101, while none appeared in account 4102. There is no evidence that Merriam's accounting arrangement was the

same as that of other dealers, even though they used similar account numbers. Whether all of the 708 transactions which were reflected in Merriam Motors' 1969 new vehicle sales journal under account 4101 occurred at the same price level or anywhere near the same price level is simply impossible to determine. Nothing indicates which component of the amount entered in that account is the price which is the target of the complaint in this action. There is likewise nothing to indicate whether the named plaintiffs' transactions and any other transactions entered in account 4101 were the same or similar. All that is shown is that 708 transactions took place and the gross income from those transactions. Because of that deficiency there is no way that the court can determine whether the named plaintiffs' transactions were the same or similar to the average or any other transactions set forth in the 4101 accounts.

The named plaintiffs had available for inspection the dealers' new car invoices. An examination could have revealed the actual number of transactions which took place during the period in question which were similar or identical to those of the named plaintiffs. The method used by Dr. Taylor falls short of showing that the named plaintiffs' transactions are typical of the claims of the purported class. Additionally, the failure to translate dollar sales ratios into units necessarily weakens the foundation upon which the damage theory of Dr. White was premised. A discussion of that theory will be deferred until a later point in this memorandum.

## MANAGEABILITY

In assessing the problems of managing this as a class action, I lean upon the opinion of the United States Court of Appeals for the Second Circuit in Eisen v. Carlisle and Jacquelin, 479 F.2d 1005 (1973) (hereinafter *Eisen III*). *Eisen III* is a substantial and justifiable departure from the views expressed in an opinion filed in an earlier appeal in that case, and I therefore place little reliance on the substantial body of case law that has developed from the opinion in *Eisen II* (Eisen v. Carlisle and Jacquelin, 391 F.2d 555 (C.A.2nd Cir. 1968)).

Adopting the more restrictive view as to the size of the proposed class to be represented by the named plaintiffs in this action, I assume a class consisting of persons who purchased new Volkswagens in the greater Kansas City area from October 19, 1966, to October 19, 1970. Some 18,000 new car sales were made during that period.

In addition to the testimony which he gave involving statistical analysis of new car sales of Volkswagens in the greater Kansas City area, Dr. Taylor presented evidence on the cost of notification of members of the class and the cost of distribution of damages should damages be awarded as a result of this action. A letter of notification would cost, he testified, about 22¢ each. For a class of 18,000 persons, the cost of notice would be about $3,960.00. A letter of notice to each is proper, because each potential member of the class within the greater Kansas City area is identifiable by reasonable effort. The plaintiffs are willing and able to bear that expense.

There are problems of manageability which go far beyond the question of whether the class could be adequately notified. Not the least of these problems is that of finding a meaningful method of determining damages. Dr. Leonard A. White, chairman of the department of economics at the University of Arkansas, set forth a theory of damage determination which would provide for the application, by computer, of a formula to each individual Volkswagen transaction. The result of the application of the formula would be the damage figure suffered by each member of the class. Essentially, Dr. White's method would allow Dr. White (or some other economic expert) to arrive, by comparison with

other markets, at a price for new Volkswagens which would prevail if the greater Kansas City area were a "free market." After determining the free market price for a new Volkswagen automobile, application of the formula would show the difference between the free market price and that actually paid by each individual purchaser. That difference would be the damage allocable to each individual member of the class on his particular Volkswagen transaction.

According to the testimony of Dr. Taylor, this amount could be ascertained and the damage in the form of a check be distributed to each class member at a cost of 49¢ per member. Again, the plaintiffs indicated their willingness and ability to bear the costs of distributing the damages. The court is not strongly concerned with this cost, because of the likelihood that it would ultimately be borne by the defendants, should this lawsuit reach the point of damage distribution.

However, I am not convinced by the testimony of Dr. White that it would be unnecessary or harmful to hold an individual hearing to determine the damages of each member of the class.

One basic admonition of *Eisen III* should be reiterated: "Amended Rule 23 was not intended to affect substantive rights of the parties to any litigation." If a class action were declared, the members of the class would be parties whose rights would be directly affected by the action. In the absence of agreement of all of them, it is unacceptable to utilize an average or formula damage figure to determine the damages of each individual member of the class. My hesitancy in doing so derives basically from the testimony of Dr. White as to the composition of a free market in new automobiles. I conclude from that testimony that the existence of a "free market," as defined by Dr. White, depends upon a system of dealer-granted, individually bargained discounts from the manufacturer's suggested retail price. An application of

any of Dr. White's theories would result in the establishment of a free market price for new Volkswagens which could only be an average of all discounts that might have been individually bargained in the free market and that average reduced price would then become the "free market price" for Volkswagens.

However, such a price would not be a free market price for Volkswagens. There is nothing to indicate that new automobiles in a free market are sold at a uniform price lower than the manufacturer's suggested retail price. Rather, in a free market, according to Dr. White, each customer is able to bargain with the dealer, who is free to reduce his price from the manufacturer's suggested retail price. This discount is by no means uniform but varies with each individual transaction. Accordingly, if we assume that the greater Kansas City area market in new Volkswagens was not a free market, in that no discounts were given from the manufacturer's suggested retail price, and a free market could have existed only if each individual buyer were able to bargain a discount from the suggested retail price, a realistic measure of damages would necessarily have to take into consideration such variables as the individual's bargaining position, the willingness or unwillingness of each individual dealer or salesman to grant a discount from the suggested retail price, and market conditions which would no doubt vary substantially during the period of time involved in this lawsuit. Again, Dr. White's analysis suffers from the same infirmity as does Dr. Taylor's. His damage assessment deals with averages; there is no evidence in the record which would indicate how many transactions are or would have been an average transaction. I can find nothing to indicate that Rule 23 has abrogated the traditional means of measuring individual damages. If damages were to be awarded in this action, they should not be based on speculation or a system of av-

eraging. Rather, the compensation due each individual member of the class must necessarily reflect the damages actually suffered by that party. Any individual member of the class should have the right to come forward with evidence which could indicate the extent of the discount which he may have been granted had a free market existed, and thus show the amount of his damage. Dr. White's formula does not allow for that method of damage, allocation. A recognition that each member of the class would have a right to come into court and give evidence raises staggering problems of logistics. Manageability could not be assured, or even predicted. To afford manageability by impinging upon substantial rights—or duties—to present individualized evidence is not an acceptable goal of a class action.

## ABILITY OF THE NAMED PLAINTIFFS TO REPRESENT THE CLASS FAIRLY AND ADEQUATELY

In the course of the hearing the plaintiffs presented evidence of their financial ability to maintain expenses of this lawsuit. The plaintiff McAnany has arranged a line of credit in the amount of $5,000.00, all of which he is willing to use to pursue this action. The plaintiff Richard H. Ralston also gave evidence as to his financial resources. The court will assume, in the absence of evidence to the contrary, that the third plaintiff, Nancy Jeanne Ralston, wife of the plaintiff Richard H. Ralston, has no assets separate from those disclosed by Richard H. Ralston. Mr. Ralston has approximately $9,500.00, which he is willing to commit to the lawsuit. He is currently employed as a law professor at Creighton University in Omaha, is married, and is the father of two young children. His wife is not presently employed outside the home. It is unrealistic under the evidence developed to conclude that the plaintiffs have more than $15,000.00 available to be committed to the prosecution of this lawsuit.

The plaintiffs would be able to finance notice to the smaller class of 18,000 members. This, however, is the tip of the iceberg. It was made evident at the hearing that further costs in substantial amounts would be incurred in order adequately to protect the interests of the purported class.

The interests of the class go far beyond mere determination of whether they should or should not be members of the class and whether they can be properly apprised of the pendency of this lawsuit. In order adequately and fairly to represent the interests of the class, the named plaintiffs must sustain the burden of showing that their resources are adequate to pursue this lawsuit to completion, even in the absence of any additional financial contributions from members of the purported class. Dr. Taylor testified that the fee charged by him and his associate, Dr. White, was $2,000.00 for everything done through the hearing on the class action question. A fair inference from the record is that a minimal figure to be attached to expenses already incurred by the named plaintiffs' counsel to this point in the lawsuit is $1,000.00. Adding to that the sum of $4,000.00 for notification of the class, it is apparent that at least $7,000.-00, or nearly half of the named plaintiffs' total available resources, has been committed in this lawsuit already. This would leave them with only some $8,000.00 with which to pursue this action to completion.

Developing evidence on the merits of the action will be expensive. From Dr. White's testimony, assuming the use of his proposed manner of proceeding, it is apparent that he or others would be required to examine massive amounts of automobile sales records, not merely of the dealers who are defendants, but of other companies. A search of records must be made to determine whether a "free market" exists anywhere in the automobile industry; if one is found which can be identified as valid for use

for comparison with the greater Kansas City area Volkswagen market, a detailed study of new car sales records of both the "free market" dealers and the Volkswagen dealers in greater Kansas City will be essential. At this point in time, Dr. White has no firm convictions, much less reliable information, as to where a "free market" is to be found. No estimate of the cost of these studies was ventured by any witness, but from Dr. White's description of the scope of the studies and from the fact that the fees of Dr. White and Dr. Taylor to the date of the hearing on the class action issues are in the modest sum of $2,000.00, I find that the probable expense of developing acceptable evidence necessary to present the merits of the case would exceed substantially the amount the named plaintiffs have at their disposal.

Seeking to represent a large group of people as a class representative in a lawsuit is a very heavy responsibility. It should never be undertaken lightly, and the court should allow such representation only upon a firm foundation that the named plaintiffs are willing and financially able to shoulder that burden. Such a lawsuit should never be undertaken in the hope that at some future date the existence of a class will aid the plaintiffs in carrying the case to completion, because nobody knows whether other unidentified members of the class are able or willing to finance the action. Inadequate financing threatens the procedural and substantive interests of all members of the class.

All of this is not to say that large numbers of persons should not coalesce their finances in supporting a class action. But the pooling should be made before the suit is filed, thereby assuring sufficient resources, rather than relying upon court processes to coagulate a class who may be willing and able to underwrite the action.

It is my conclusion that the named plaintiffs have not shown their ability to protect adequately the interests of the class.

## SUMMARY AND OBSERVATIONS

In summary, then, the court finds the following:

1. The named plaintiffs have not sustained their burden of showing that the claims of the representative parties are typical of the claims of the class;

2. The named plaintiffs have not sustained their burden of showing that this action would be manageable if maintained as a class action; and

3. The named plaintiffs have not shown that they, as representative parties, would be able adequately to protect the interests of the class.

Therefore, the action is not to proceed as a class action.

I observe that this action has been vigorously and expertly prosecuted and vigorously and expertly defended. No contrary inferences are to be drawn from the court's ruling of today. Nor is there any doubt in my mind about the plaintiffs' motives in bringing this action. The court fully accepts the statements of the plaintiffs that this action was brought as a result of their feeling that the federal law had been violated by the various defendants.