Gloria WOLKENSTEIN, Kathryn Silkes, Philip Rumore and Vincent Nola, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Eugene T. REVILLE, individually and as Superintendent of Schools; Claude D. Clapp, individually and as Chief Fiscal Officer of the City of Buffalo Public School System; Florence E. Baugh; David Kelly; Joseph E. Murphy; Louis C. Benton; Joseph D. Hillery; Mozella Richardson; Dennis Bulera; Oscar Smuckler; John C. Fiorella, as members of the Board of Education of the City School District of the City of Buffalo, Defendants.

No. CIV-77-618.

United States District Court, W. D. New York.

Jan. 20, 1982.

Robert D. Clearfield, Buffalo, N. Y., for plaintiffs.

Joseph P. McNamara, Corp. Counsel, Buffalo, N. Y., for defendants.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

Plaintiffs have brought this class action on behalf of themselves and others similarly situated, seeking a judgment declaring the procedures set forth in section 210 of New York's Civil Service Law ["CSL"] unconstitutional on their face and as applied because they deprive public employees of their property without due process of law. Plaintiffs allege that these procedures are defective in that they (1) fail to provide an impartial initial hearing on the question of strike participation, and (2) do not provide any hearing at all prior to the commencement of deductions from wages as a penalty for strike participation. Plaintiffs also seek to recover the amounts deducted from their wages and from the wages of the class in accordance with those procedures. Now before me are plaintiffs' motions for class action certification pursuant to Fed.R.Civ.P. rule 23 and for summary judgment pursuant to Fed.R.Civ.P. rule 56. Defendants have submitted memoranda opposing plaintiffs' motion for summary judgment; no opposition has been raised anent the motion for class action certification.

*Background*

The individual plaintiffs, together with "all others similarly situated" in this case, comprise a body consisting of nearly 3,000 persons, all of whom were teachers in the Buffalo public school system at the time of a teachers' strike beginning September 7, 1976 and ending September 24, 1976. On October 14, 1976 defendant Reville, Buffa-

lo's Superintendent of Schools, determined that this strike violated CSL § 210 and that each of the individual plaintiffs and all of the members of the class had participated in the strike. By a notice dated October 14, 1976, Reville informed plaintiffs and the members of the proposed class of this determination and advised them that they were subject to the penalties provided by CSL §§ 210.2(f) and (g). These paragraphs, since repealed,[1] imposed on striking public employees a one-year probationary period and payroll deductions in an amount equal to twice the daily rate of pay for each day of participation in a strike.

According to a stipulation by the parties, the named plaintiffs filed objections to Reville's October 14th determinations, as authorized by CSL § 210.2(h), which provides for review by Reville of his initial determination. On December 3, 1976 the named plaintiffs received form notices summarily dismissing their objections and denying a hearing, on the grounds that they had failed to establish that they did not participate in the strike or to raise a question of fact as to their participation, as provided by section 210.2(h). Altogether approximately 400 members of the proposed class filed such objections, of whom about 325 were denied hearings on the same grounds. These secondary determinations by Reville were challenged by several class members in the New York courts, pursuant to CSL § 210.2(h) and Article 78 of New York's Civil Practice Law and Rules ["CPLR"]. It is stipulated that of these challenges only three led to a hearing on the merits. The results of these hearings have not been indicated.

It is further stipulated that defendant Clapp caused approximately six million dollars in section 210 penalties to be deducted from the salaries of the members of the proposed class, the deductions being made in three parts from paychecks due on the third, seventeenth and thirty-first of December, 1976. It is stipulated that this entire amount was retained by defendants and applied by them to the operating budget and expenses of the Buffalo School District.

*Plaintiffs' Motion For Class Action Certification*

In order to certify an action as a class action this Court must be satisfied both that the prerequisites to a class action stated in Fed.R.Civ.P. rule 23(a) are met and that the action falls in one of the categories set forth in Fed.R.Civ.P. rule 23(b).

The rule 23(a) prerequisites to a class action are four:

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Prerequisite (2) presents no obstacle to certification here. There are apparently no questions of fact involved, except tangential issues related to the requested relief. Plaintiffs urge the invalidity of the law under which they were penalized without regard to factual guilt or innocence. This contention is the only central question of law presented by the Complaint and it is clearly common to all who were penalized under the statute in issue. This point demonstrates that the typicality requirement of prerequisite (3) is also satisfied.

The numerosity requirement, prerequisite (1), would also appear to be amply satisfied where the class that plaintiffs allege to be entitled to relief numbers nearly 3,000 members. It has been observed that "while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the [numerosity] requirement." 3B *Moore's Federal Practice*, ¶ 23.05[1].

Although defendants have not directly opposed certification, they have made a passing reference to the plaintiffs' "failure

---

1. The paragraphs prescribing the procedure for imposing these penalties (CSL § 210.2(d), (e), (h)), challenged by plaintiffs on due process grounds, are still in effect.

to exhaust their administrative remedies," in opposing plaintiffs' motion for summary judgment. Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, at p. 6. If the failure of most members of the putative class of nearly 3,000 plaintiffs to avail themselves of state administrative remedies under CSL § 210.-2(h) would bar them from participating in the present action, the number of the potential class would be greatly reduced and fulfillment of the numerosity prerequisite would become less apparent.

■ Such a result is not warranted here. Although the exhaustion requirement applies to class actions just as it does to individual actions, "it is not necessary for each member of an alleged class to exhaust administrative remedies in order for a class action to be maintained." *Barlow v. Marion Cty. Hospital Dist.*, 495 F.Supp. 682, 693 (M.D.Fla.1980). The rule, rather, is "that exhaustion by at least one member seeking to represent the class is a necessary prerequisite for a class action." *Ibid.*, citing *Swain v. Hoffman*, 547 F.2d 921 (5th Cir. 1977), and *Phillips v. Klassen*, 502 F.2d 362 (D.C.Cir.1974). Inasmuch as it is apparent from the defendants' own representations that many of the class here have exhausted the state administrative remedies, with six of them actually proceeding to state judicial review of the administrative determinations, no exhaustion problem arises in this case to obstruct certification of the proposed class.

Other grounds also support this conclusion. The United States Court of Appeals for the Second Circuit has recently indicated that exhaustion of state administrative remedies is not required where a plaintiff's federal civil rights claim is that the available state administrative remedies cannot afford due process of the law, so that "the adequacy of the remedy is 'for all practical purposes coextensive with the merits of the plaintiff's constitutional claim.'" *Swan v. Stoneman*, 635 F.2d 97, 103–04 (1980). Plaintiffs here, like the plaintiff in *Swan v. Stoneman*, have directly challenged the sufficiency of the state

remedies so that "it would be pointless to require [plaintiffs] to exhaust those remedies." *Id.* at 104. Also arguing for this result is the unavailability of the desired class relief in the state administrative procedures. *See, id.*, at 104–05. It should be additionally noted that "[i]t is well settled that exhaustion of state judicial remedies is not a prerequisite to adjudication of [42 U.S.C.] § 1983 claims in federal court." *Id.* at 102.

I conclude, then, that the exhaustion doctrine poses no obstacle to inclusion of the entire class argued for by plaintiffs, and that a class numbering nearly 3,000 satisfies the numerosity requirement of Fed.R.Civ.P. rule 23(a)(1).

The fourth prerequisite under rule 23(a), that the individual plaintiffs will adequately represent the interests of the class, presents a subtler question. As the United States Court of Appeals for the Second Circuit has put it,

"an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that plaintiff has interests antagonistic to those of the remainder of the class." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (1968).

Nothing has appeared to suggest to me that plaintiffs' counsel is not competent to conduct the present litigation. Neither has there been any indication that this is a collusive lawsuit or that the individual plaintiffs' interests conflict with those of the class they seek to represent.

However, in recent years the financial resources of individual plaintiffs have become a significant factor in assessing ability to conduct the proposed litigation, numerous courts having denied class certification to financially weak plaintiffs. *See, e.g., National Auto Brokers Corp. v. General Motors Corp.*, 376 F.Supp. 620, 637–38 (S.D.N.Y.1974) (weak financial condition); *Held v. Missouri Pacific Railroad Company*, 64

F.R.D. 346, 350 (S.D.Texas 1974) (plaintiff lacked resources to notify other members of the class and meet other expenses); *Ralston v. Volkswagenwerk, A.G.*, 61 F.R.D. 427 (W.D.Mo.1973). The question of individual plaintiffs' financial ability to well represent an entire class should not be dealt with lightly, especially where, as here, the issues directly touch the rights of many more than the members of the class.

■ Plaintiffs have the burden of proving that they will adequately represent the interests of the class. *See, e.g., Matarazzo v. Friendly Ice Cream Corporation*, 62 F.R.D. 65, 68 (E.D.N.Y.1974). The Plaintiffs' "Motion for Certification Under F.R. C.P. 23" and supporting affidavit and memorandum of law establish in the main that the individual plaintiffs will adequately represent the proposed class insofar as commonality of interest is concerned, but also raise the question whether it is proper to permit plaintiffs' financial capability to be bolstered by the resources of organizations who are not and cannot be parties to this lawsuit. Plaintiffs' papers clearly indicate that such organizations will bear the brunt, if not the entirety, of the costs of this litigation. If this arrangement is not proper, then plaintiffs will have failed to meet their burden of proving adequacy of representation. However, I think that in all the circumstances of this case it is not improper.

The allegations in plaintiffs' moving papers clearly establish that it is with the resources of the Buffalo Teachers Federation, Inc. and its state affiliate, the New York Educators Association (whose employees plaintiffs' lawyers are), that plaintiffs are able to conduct this litigation.

A recent decision of the United States District Court for the Northern District of New York, *Brame v. Ray Bills Finance Corp.*, 85 F.R.D. 568 (1979), considered the propriety, in terms of both financial and ethical adequacy of representation, of permitting an organization that provides free legal services to indigents to advance and be ultimately responsible for the costs of a class suit. The individual plaintiff was not indigent but was nonetheless unable to finance the litigation. The court saw no obstacle to finding that this arrangement rendered the plaintiff a financially adequate representative. *Id.*, at 576. As to the ethical objections of the defendants, the court found that, because "public or charitable funds, and not the personal funds of plaintiffs' attorneys," were supporting the litigation, such attorneys did not have interests in conflict with the named plaintiffs or the class, such as may arise where an attorney acquires a financial interest in the outcome of the litigation. *Id.*, at 578–79.

The situation confronting us compares favorably to that in *Brame v. Ray Bills Finance Corp., supra.* The funds involved are not public or charitable, but neither are they those of plaintiffs' lawyers; the funds are those of organizations whose interests are presumably coextensive with plaintiffs' interests. Such a voluntary assumption of litigation costs, by organizations which are benign from an ethical point of view, should pose no problem for class action certification.

Comparison with the reasoning and decision in *Ralston v. Volkswagenwerk, A.G., supra*, where plaintiffs were denied certification, further supports this result. The court in *Ralston* inquired closely into the financial resources of the individual plaintiffs, observing that in order to be considered adequate representatives they "must sustain the burden of showing that their resources are adequate to pursue this lawsuit to completion, *even in the absence of any additional financial contributions from members of the purported class.*" 61 F.R.D. at 433. (Emphasis added.) This stricture against reliance upon contributions from the class was made because of the uncertainty in that case that such support was forthcoming, the court noting that the "very heavy responsibility" of a class lawsuit "should never be undertaken in the hope that at some future date the existence of a class will aid the plaintiffs, because nobody knows whether other unidentified members of the class are able or willing to finance the action." *Id.*, at 434. The court

further observed: "All of this is not to say that large numbers of persons should not coalesce their finances in supporting a class action." *Ibid.* In the case before me there is apparently no uncertainty that the necessary funds to support this action will proceed from groups comprised of persons who are either members of the class or whose interests are directly aligned with the class members.

Finally, the policy expressed in Fed.R. Civ.P. rule 23.2 seems to support allowing organizations that themselves lack standing to finance a class action suit. The Advisory Committee's Notes to this rule, which was added in 1966, indicate that the purpose of viewing an action by or against members of an unincorporated association as a class action "has been to give 'entity treatment' to the association when for formal reasons it cannot sue or be sued as a jural person." The rule itself clearly states that a class action may be brought "by * * * the members of an unincorporated association by naming certain members as representative parties." This language clearly implies that the resources of a group that lacks standing may support a class action in the name of representative parties.

■ The Buffalo Teachers Federation lacks standing, even though incorporated, because of the personal nature of the rights involved. The policy of rule 23.2 and the reasoning in the cases discussed above nonetheless argue that the backing of the Buffalo Teachers Federation and its state affiliate may constitute plaintiffs financially adequate class representatives, and I so find them.

■ The rule 23(a) prerequisites to a class action having been found satisfied, it remains only to determine whether or not this action is maintainable as a class action under rule 23(b). Plaintiffs argue that, if individual actions were brought by the aggrieved parties, there is a risk of inconsistent and varying adjudications which would bring the case within rule 23(b)(1)(A). However, I do not think that such is a great risk where the primary relief sought is a declaration that a statutory scheme is con-

stitutionally defective. Similarly, there is small risk that "adjudications with respect to individual members of the class * * * would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests," the test of rule 23(b)(1)(B).

■ Thus, neither clause (A) or (B) of rule 23(b)(1) is clearly applicable here. However, both paragraph (2) and paragraph (3) of rule 23(b) seem quite relevant. Rule 23(b)(2) provides that a class action may be maintained where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Defendants applied the challenged statutory sanctions to each of the members of the proposed class, and thus "ha[ve] acted * * * on grounds generally applicable to the class." This paragraph so plainly applies to the instant proceeding that I find it unnecessary to deal with the applicability of paragraph (3), which, having considered the matter, I nonetheless find to apply here.

Thus I grant plaintiffs' motion for class action certification. The class of persons is to consist of all persons who were penalized by defendants acting pursuant to CSL § 210, owing to their involvement in the teachers' strike that occurred in Buffalo between September 7th and 24th, 1976.

*Plaintiffs' Motion for Summary Judgment*

In June, 1979 I denied defendants' motion to dismiss the Complaint, finding that plaintiffs had stated a claim regarding the potential bias of both Reville in his role as adjudicator and of any hearing officer appointed by Reville to hear plaintiffs' objections to Reville's determinations of strike participation. I also held that neither party had yet sufficiently delineated the precise interests or facts involved in plaintiffs' claim regarding the lack of a prededuction hearing to permit the application of due process principles. Today, I find it necessary to deny plaintiffs' motion for summary

judgment and to grant summary judgment to defendants as to all plaintiffs' claims, for the reasons and upon the analysis hereafter stated.

*Lack of Initial Impartial Hearing Due to Bias of Reville*

The statutory procedural provisions of CSL § 210.2 under which plaintiffs claim they were not afforded an impartial initial hearing as to whether they participated in the 1976 strike read in relevant part as follows:

"(d) Determination. In the event that it appears that a violation of this subdivision may have occurred, the chief executive officer of the government involved shall, on the basis of such investigation and affidavits as he may deem appropriate, determine whether or not such violation has occurred and the date or dates of such violation. If the chief executive officer determines that such violation has occurred, he shall further determine, on the basis of such further investigation and affidavits as he may deem appropriate, the names of employees who committed such violation and the date or dates thereof. Such determination shall not be deemed to be final until the completion of the procedures provided for in this subdivision.

\* \* \* \* \* \*

"(h) Objections and restoration. Any employee determined to have violated this subdivision may object to such determination by filing with the chief executive officer, (within twenty days of the date on which notice was served or mailed to him \* \* \*) his sworn affidavit, supported by available documentary proof, containing a short and plain statement of the facts upon which he relies to show that such determination was incorrect. \* \* \* If the chief executive officer shall determine that the affidavit and supporting proof fails to establish that the employee did not violate this subdivision, he shall sustain the objection. If the chief executive officer shall determine that the affidavit and supporting proof fails to establish that the employee

did not violate this subdivision, he shall dismiss the objection and so notify the employee. If the chief executive officer shall determine that the affidavit and supporting proof raises [sic] a question of fact which, if resolved in favor of the employee, would establish that the employee did not violate this subdivision, he shall appoint a hearing officer to determine whether in fact the employee did violate this subdivision after a hearing at which such employee shall bear the burden of proof. \* \* \* If the chief executive officer sustains an objection or the hearing officer determines on a preponderance of the evidence that such employee did not violate this subdivision, the chief executive officer shall forthwith restore to the employee the tenure suspended pursuant to paragraph (f) of this subdivision, and notify the chief fiscal officer who shall thereupon cease all further deductions and refund any deductions previously made pursuant to this subdivision. The determinations provided in this paragraph shall be reviewable pursuant to article seventy-eight of the civil practice law and rules."

This procedure thus places on the chief executive officer the responsibility to determine in the first instance who has engaged in an illegal strike, and thereafter to determine the correctness of those determinations regarding employees who file objections to the initial determination in their cases. This subsequent determination, should it be against the objecting employee, is not reviewable *de novo*, either by a hearing officer or court, but is subject to review only to determine whether it was arbitrary and capricious, as provided by Article 78 of the CPLR for determinations other than those made upon evidence taken at a lawful hearing (CPLR § 7803.3).

Plaintiffs complain that Reville, the "chief executive officer" here, has a potential personal interest in these determinations great enough so that plaintiffs were not accorded due process of law in being subjected to his judgment. Plaintiffs rely for this conclusion chiefly on *Tumey v.*

*Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (wherein it was held that due process required reversal of convictions by the mayor of a town when the mayor's salary was paid in part by fines and costs that he levied in his judicial role) and on *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (wherein a procedure by which sums produced from a mayor's court accounted for a substantial portion of a village's total revenues was invalidated under the due process clause, even though the mayor's salary was not augmented by those sums).

■ I note that, even apart from the "job considerations" which plaintiffs say created an impermissible risk of bias, a statutory provision whereby an adjudicator of rights reviews his own initial finding is, at best, inherently suspect on due process grounds. *See, Withrow v. Larkin*, 421 U.S. 35, 58, n.25, 95 S.Ct. 1456, 1470, n.25, 43 L.Ed.2d 712 (1975), *citing Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), wherein it is observed that "the officer directly involved in making recommendations cannot always have complete objectivity in evaluating them." (408 U.S. at 486, 92 S.Ct. at 2602). In *Morrissey* the Court premised its analysis on the assumption that the parole officer's review of his own recommendation for parole revocation was final (408 U.S. at 476–77, 92 S.Ct. at 2597–98), whereas in this case Reville's rejection of objections to his initial determination of strike participants was reviewable

in a judicial article 78 proceeding, for the employees choosing to seek review. However, as I have noted, article 78 review is not *de novo* but will lead to affirmance if Reville's decision is not arbitrary or capricious—an exacting standard that can cover a multitude of misdeterminations.[2] Moreover, the procedure for parole revocation that the Court prescribed in *Morrissey* called for a review of the revocation recommendation by an independent decision maker as a *preliminary* to a full hearing *de novo*. 408 U.S. at 485–86, 92 S.Ct. at 2602–03. This is in line with the oft-enunciated principle that an accused "is entitled to a neutral and detached judge in the first instance" (*Ward v. Village of Monroeville, supra*, 409 U.S. at 61–62, 93 S.Ct. at 83–84), the non-observance of which is not excused by the availability of review *de novo* (*ibid.*), which review was unavailable here.

Notwithstanding these tentative criticisms of the section 210 procedure, I discern a distinction between this case and *Morrissey* that, with other considerations, leads me to refrain from pronouncing the instant procedure constitutionally defective under *Morrissey*. It appears that the United States Supreme Court's criticism of the procedure at issue in *Morrissey* was evoked not only by the "double adjudication" by a single individual—a parole officer's revocation recommendation followed by a self-affirmance of that recommendation—but also in part by the *extent* of the parole officer's pre-involvement in the parolee's case.[3] Un-

---

2. *Cf., Sanford v. Rockefeller*, 35 N.Y.2d 547, 573 ·76, 364 N.Y.S.2d 450, 471–73 [324 N.E.2d 113] (1974) (dissenting opinion of Judge Wachtler), suggesting that the "substantial evidence" standard of CPLR § 7803.4 applies to the superintendent's determinations, but concluding nonetheless as to article 78 as a whole that "[i]f a procedure is constitutionally defective at the administrative level, article 78 cannot rectify it," because "article 78 is not designed to supply due process; it is not an evidentiary hearing but merely an evaluation of what has gone before."

3. "Parole agents are human, and it is possible that friction between the agent and parolee may have influenced the agent's judgment." 408 U.S. at 486 n.14 [92 S.Ct. at 2603 n.14]. In the absence of countervailing considerations, I

would declare any such possible distinction as either overcome by Reville's pre-involvement in the failed collective bargaining process and in the superintendence of teacher conduct in general pursuant to N.Y. Education Law § 2566 (see note 6 *infra*), or else counterbalanced by the complete absence of *de novo* review. Neither the cases nor the constitution support distinguishing *Morrissey* on the grounds that the parolee's interest in physical liberty is greater than an employee's interest in his or her earnings; the utmost circumspection required of our government when it acts to diminish its subjects' possessions of whatever form does not require full procedural protections in all cases, but an impartial initial adjudication is an irreducible minimum (*Cf., Ward v. Village of Monroeville, supra*). Here, as much as in *Morrissey*, it can be said that "[a] State could

der this view the legality of the superintendent's role under section 210 may become bound up with plaintiffs' claim that his responsibility for collective bargaining with teachers, plus his primary role in arranging the school district's budget, rendered him unfit under the principles of *Ward v. Village of Monroeville, supra,* to determine who had participated in the strike, especially where his determinations appreciably augmented the school district's fisc.[4] As explained hereafter, I find it necessary to reject plaintiffs' challenge under *Ward,* and so also decline to invalidate the challenged procedures under *Morrissey.*

The section 210 procedures have in recent years been challenged for failure to provide impartial adjudication in several cases brought by teachers in the district courts of New York. In *Kornit v. Board of Ed., Plainview-Old Bethpage School District,* Civ. No. 75–518 (E.D.N.Y., July 22, 1975), *remanded* (for lack of subject matter jurisdiction) 542 F.2d 593 (2d Cir. 1976), *remanded* (for further consideration) 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1144, *aff'd* (without opinion [5]), 591 F.2d 1330 (2d Cir. 1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 495 (1979), the first of these cases, the district court judge rejected the charge of bias due to pecuniary interest in augmenting the school district budget:

> "There is no indication that any school official had a personal pecuniary interest which would be affected by whether plaintiff's absence from work was authorized or excusable, as was the case in *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689 [36 L.Ed.2d 488] (1973). In the second place, the provision for judicial review of any administrative decision under Article 78 of the New York Civil Practice Law and Rules would permit determination of this point." Slip Opinion at p.6.

certainly choose some other independent decision maker to perform this preliminary function." 408 U.S. at 486 [92 S.Ct. at 2603].

It is true that in *Hortonville Dist. v. Hortonville Ed. Assn.,* 426 U.S. 482 [96 S.Ct. 2308, 49 L.Ed.2d 1] (1976), the argument that the prior role as negotiator of the Board in that case disqualified it, under *Morrissey,* from deciding to fire the striking teachers was rejected. However, in *Hortonville* only the particular decision of the petitioner there had been assailed on due process grounds, not the constitutional sufficiency of the state statute involved. It is clear that the Court found that the prior negotiations did not disqualify the Board from imposing the sanction of discharge because (1) "there was no possibility of an erroneous factual determination on [the] critical threshold issue" of who had engaged in the strike, inasmuch as all the discharged teachers had admitted their participation (426 U.S. at 494 [96 S.Ct. at 2315]); and (2) "[t]he Board's decision whether to dismiss striking teachers involves broad considerations," its decision "was only incidentally a disciplinary decision; it had significant governmental and public policy dimensions as well." 426 U.S. at 482 [96 S.Ct. at 2308]. Here, by contrast, the plaintiffs' class members have not all admitted engaging in the 1976 strike and it is precisely this "critical threshold determination" that Reville was charged with and is in issue here. The imposition of penalties is here at issue only to the extent that it flowed from Reville's findings as to who were strike participants, because the section 210 penalties involved are automatic and inflexible.

4. According to the factual stipulation of the parties, about 325 of the nearly 3,000 class members here, over one-tenth, were denied hearings by Reville on their objections to his preliminary determination that they had participated in the strike, on the ground that their objections raised no issue of fact regarding this question. The stipulation indicates that about $6,000,000 was deducted from the wages of all the class members in this action and thereafter used to defray school district expenses, suggesting that about $600,000 was derived from penalties imposed upon those to whom Reville denied hearings alone. This sum, although perhaps not great in relation to the total Buffalo Board of Education budget for 1976–77 (see text *infra*) nonetheless quite certainly would have paid the salaries of at least thirty teachers or about one-tenth of the total force at that time. Further evaluation of the significance of the penalty amounts appear in the text, *infra.*

5. The appellate order adopting a portion of Judge Judd's initial decision did however explicitly set forth that "[t]he school officials involved did not have a sufficient pecuniary interest to disqualify them" and cited *Hortonville Dist. v. Hortonville Ed. Assn., supra.* The slip opinion and the 1978 appellate order in *Kornit* were furnished as Exhibits A and B to the Memorandum of Law on Behalf of the Attorney General of the State of New York, Intervenor.

I have already indicated my perception that article 78 review, which is not *de novo*, could not possibly make up for a failure to provide an impartial adjudication in the first instance—which is in any case a constitutional entitlement regardless of subsequent provisions of procedure. The United States Court of Appeals for the Second Circuit evidently concluded that the plaintiff in *Kornit* had failed to establish a significant potential for bias in the first instance adjudication, for the court ultimately affirmed the district court's judgment "substantially for the reasons stated by the [district court judge]."

Three district courts have, since *Kornit*, turned back claims like that advanced in *Kornit* and in the instant case that hearings were biased, mainly on the strength of the affirmance in *Kornit*. *Starrs v. Bock*, Civ. No. 77–5435 (S.D.N.Y., December 21, 1978), 12 P.E.R.B. 7501; *Tepper v. Galloway*, 481 F.Supp. 1211 (E.D.N.Y.1979); *O'Brien v. Board of Ed. of City Sch. Dist., Etc.*, 498 F.Supp. 1033 (S.D.N.Y.1980).[6] While the earnest challenges of New York teachers to the Taylor Law procedures on the grounds of bias inherent in the procedures merit a thorough and authoritative reexamination, I too shall defer to our Court of Appeals on this question, addressed by that court in its affirmance of *Kornit*. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1979), has created good grounds for reexamining the relevance of the decision in *Hortonville Dist. v. Hortonville Ed. Assn.*, *supra*, which plaintiffs tenably urge is distinguishable on several significant grounds from the case of New York teachers under the Taylor Law.[7]

6. In response to the *O'Brien* plaintiff's contention "that the courts in *Tepper, Starrs* and *Kornit* neglected to give due weight to the Supreme Court's decision in *Ward v. Monroeville*," the court in *O'Brien* noted that:

"The Court in *Ward* distinguished the case of *Dugan v. Ohio*, 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928), in which a mayor who shared legislative and executive authority with four other persons was found to have a sufficiently remote relationship to the finances of the city to warrant leaving undisturbed the presumption that the mayor would act impartially when he sat as judge." 498 F.Supp. at 1035.

The *O'Brien* court concluded that the role of the chief executive of a school district in New York is sufficiently like that approved in *Dugan* to shield him or her from criticism upon *Ward* principles when fulfilling the role assigned by CSL § 210 (*id.* at 1036). However, the Court in *Dugan* emphasized that

"[t]he mayor has himself as such no executive but only judicial duties. His relation under the [City of] Xenia charter, as one of five members of the city commission, to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, is remote." 277 U.S., at 65 [48 S.Ct., at 440].

Reville as superintendent has a direct relation to the executive and financial policy, as well as broad powers "[t]o enforce all provisions of law and all rules and regulations relating to the management of the schools." (N.Y. Education L. § 2566.2.) He prepared the school district budget and submitted it to the Board of Education. He was responsible for the disciplining of teachers, being authorized "to report to [the] board of education violations of regulations and cases of insubordination, and to suspend [a] * * * teacher * * * until the next regular meeting of the board" (N.Y. Education L. § 2566.6.) *Quaere* whether a teacher whom the superintendent had naturally come in the course of his duties to regard as a troublemaker or misfit can feel assured of due process as the superintendent reviews his or her objections to the determination of strike participation? The superintendent was also responsible for collective negotiations with the teachers' union. This role is not like that of the detached adjudicator approved in *Dugan*, but more like that of the excessively involved adjudicators condemned in *Morrissey* and in *Ward*.

7. For example, in *Hortonville* no pecuniary penalties were exacted, so there can have been no incentive to add to the Board's operating budget. And, as I have already pointed out, *supra* note 2, there was no question in *Hortonville* as to how many and which teachers had struck. Moreover, the challenged decision to discharge 86 teachers was made jointly by a seven-member elected school board, whereas Reville was a single individual retained on a contractual basis by the Buffalo Board of Education. The public, the employers of the *Hortonville* decision makers, might be seen as less likely to recognize and be grateful for a decision that redounded to the benefit of the Board in relation to the discharge of its duties, than would the Buffalo Board of Education be to appreciate the difference made by the $6,000,000 accruing to its budget as a result of Reville's determinations.

Recognition of these distinctions suggests that, in the situation of the instant case, more than that in *Hortonville*, there is a significant

In *Marshall v. Jerrico* an Assistant Regional Administrator of the Employment Standards Administration ("the ESA") of the United States Department of Labor had assessed fines against the appellee for employing child labor in restaurants. Under section 16(e) of the Fair Labor Standards Act (29 U.S.C. § 216(e)), such sums are returned to the ESA to reimburse the costs of determining violations and assessing penalties and may be allocated to ESA regional offices. The appellee had brought suit in federal district court, urging that this arrangement "created an impermissible risk and appearance of bias by encouraging the Assistant Regional Administrator to make unduly numerous and large assessments of civil penalties." 446 U.S. at 241, 100 S.Ct. at 1612. The district court judge, acknowledging that the *de novo* review of the original assessment by an administrative law judge was unaffected by any interest in the amounts of penalties, nonetheless granted summary judgment for the appellee because the section 16(e) reimbursement arrangement "could distort the administrator's objectivity in assessing penalties." *Id.* at 241–42, 100 S.Ct. at 1612–13.

Although the plaintiffs' claims here of potential bias are significantly broader than that Reville had a personal interest in adding to the school district's funds, this is an important part of their claim; consequently, the United States Supreme Court's treatment of the analogous claim in *Marshall v. Jerrico* may shed light on the merits of plaintiffs' argument on this ground.

The United States Supreme Court reversed the district court in *Marshall* essentially upon three considerations:

(1) The Assistant Regional Administrator "performs no judicial or quasi-judicial functions. He * * * rules on no disputed factual or legal questions. The function of assessing a violation is akin to that of a prosecutor or civil plaintiff." *Id.* at 247 [100 S.Ct. at 1615];

(2) "If the employer excepts to a penalty * * * he is entitled to a *de novo* hearing before an administrative law judge." *Ibid.*;

(3) Upon close analysis of the dollar amounts involved, the Court concluded that "[i]n all three years [in question] the sums collected as child labor penalties amounted to substantially less than 1% of ESA's budget. And in each of those years, ESA did not spend the full amount appropriated to it * * *. The amounts returned to the Treasury * * * substantially exceeded the sums collected under § 16(e) in all three years. The challenged provisions have not, therefore, resulted in any increase in the funds available to ESA over the amount appropriated by Congress." *Id.*, at 245–46 [100 S.Ct. at 1615].

The absence of the first two considerations (which relate to the applicable substantive standard) in the present case is patent. Reville clearly made judicial or quasi-judicial determinations on disputed factual or legal questions when he determined initially that plaintiffs and their class had struck, and subsequently that hundreds of the objections filed with him raised no question of fact regarding strike participation. These determinations moreover were not subject to *de novo* review, but only to limited article 78 review. Thus "[t]he rigid requirements of *Tumey [v. Ohio, supra]* and *Ward [v. Village of Monroeville, supra]*, designed for officials performing judicial or quasi-judicial functions" (446 U.S. at 248, 100 S.Ct. at 1616), found inapplicable in *Marshall*, fully apply here.

The third consideration, the insignificance of the penalties assessed to the overall budget of the ESA, also is not present here. It must, of course, be borne in mind that Reville had direct responsibilities in formulating the budget of the Buffalo Board of Education and in supervising ex-

danger, if not to the reality then to the appearance of fairness, which "[generates] the feeling, so important to a popular government, that justice has been done." *Marshall v. Jerrico, supra*, 446 U.S. at 242 [100 S.Ct. at 1613],

quoting from *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 172 [71 S.Ct. 624, 649, 95 L.Ed.2d 817] (1951) (Frankfurter, J., concurring).

penditures. During the period in question, there was not the surplusage in the budget for the Buffalo Board of Education that the ESA had enjoyed in the period relevant in *Marshall.* For the 1975–76 fiscal year, the Board had requested an appropriation of $112,609,122, the Mayor of Buffalo had recommended that it receive $106,926,344, and the Buffalo Common Council had approved only $103,826,344. 1975 *Proceedings of the Buffalo Common Council* [hereinafter "*Proceedings*"], 1212, 1606. For 1976–1977 the Board had requested $119,213,177, which the Mayor had reduced to $91,742,337, and the Board was eventually allotted only $108,399,337 by the Common Council. 1976 *Proceedings* 1119, 1587.

It is axiomatic that administrative bodies usually request more funding than they hope to receive and truly feel that they need. However, the indications are that the Buffalo Board of Education probably needed more funds than it received during this period. By a letter to the Common Council dated July 17, 1975, the Mayor indicated that the Board of Education and Reville had appeared before him seeking a supplemental budget for the 1975–76 school year of $4,975,956 to prevent termination of kindergarten, the free school bus-pass program, and adult education activities. 1975 *Proceedings* at 2085. The Mayor reduced this request to $4,266,546, which the Council approved. *Id.* at 2214.

Skipping for the moment the 1976–77 school year, the year of the strike, it appears that in 1977 the Board made an earnest request for an $11,400,000 supplemental budget for the 1977–78 school year, which the Mayor apologetically recommended be allowed only to the extent of $4,000,000, which amount the Common Council granted. 1977 *Proceedings* 3003, 3095. In recommending this reduced amount the Mayor wrote of the "many painful but necessary decisions" including "wage freezes, layoffs and hiring freezes," by which "[o]ver the past few years, the City has successfully regained fiscal credibility." *Id.* at 3004. It is in this financial setting, far different from that depicted for the ESA in *Marshall v. Jerrico*, that the importance to the Buffalo Board of Education and Reville of the $6,000,000 strike penalties must be assessed.

For the 1976–77 school year, the year in which the strike penalties were deducted from plaintiffs' wages, the Board evidently had to make a far smaller supplemental budget request than in either the preceding or subsequent years. The Board requested only $1,741,508, which the Mayor reduced to $1,500,000 and put before the Council on December 23, 1976, not long after the strike penalty deductions were begun. 1976 *Proceedings* 2982.[8]

Under these financial circumstances, where the Superintendent was an active part of the budgetary processes, it may not be possible to find that Reville's personal interest in the penalty exactions was so remote that no tenable inference of bias can reasonably be drawn. The United States Supreme Court in *Marshall v. Jerrico* declined to say whether the far more remote connections between the decision maker, the penalties and the fisc in that case would support constitutional objections under the standards of *Ward* and *Tumey*. 446 U.S. at 252, n.14.[9] The clear and definite connec-

8. This factual context, which was disclosed not by presentations of plaintiffs but by the investigation of the court, could perhaps strongly support a claim that the section 210 procedures are unconstitutional as applied to plaintiffs. Plaintiffs did in fact recite such a claim in their Complaint, but have never offered either allegations or proof of facts to support it, compelling the conclusion that plaintiffs have chosen to press only their claim of inherent unconstitutionality in the challenged procedures. In view of the high likelihood of recurrence of a factual context similar to this in future strikes of New York teachers, and the other potentially prejudicing entanglements of the chief executive officer (see note 3, *supra*), I conclude as perhaps plaintiffs did also that the constitutional sufficiency of the section 210 procedures must be assessed without reference to the facts of a particular application. The figures in the text are offered only to demonstrate the stressful financial context in which a chief executive officer of a New York school district may have to make decisions pursuant to CSL § 210.

9. In its conclusion, the Court in *Marshall v. Jerrico* recited five contingencies that would

tions here, where these standards do apply, plus the other entanglements of Reville in the supervision of teachers and in making the initial determinations of strike participants for his own subsequent review, would warrant a full exploration of the relevance of the *Ward, Tumey* and *Morrissey* principles were I not constrained by *Kornit v. Board of Education, supra.* I do not find *Marshall v. Jerrico* a sufficiently sure guide to support a decision by me in possible conflict with that in *Kornit.* Plaintiffs' motion for summary judgment on their claimed denial of an impartial hearing must be denied. Because I view *Kornit* as effectively foreclosing further argument along this line, summary judgment against the movants and for defendants is proper at this time (*see, Doe v. United States Civil Serv. Com'n*, 483 F.Supp. 539, 571 n.29 (S.D. N.Y.1980)).

### Hearing Officer Appointed by Reville

██ Having concluded that it would be improper to invalidate the section 210 procedure for the initial determination of strike participation, and the subsequent determination of possible merit in objections thereto, on the grounds that Reville is an inappropriate adjudicator of these issues, the further conclusion is compelled that the mere appointment of an officer by Reville to hear those objections does not render the section 210 procedure for hearing objections invalid. Moreover, this conclusion would be required even if it had been determined that the role of Reville in making the initial determination and in initially assessing the merits of objections does render those procedures defective. In *Morrissey v. Brewer, supra,* the Court clearly indicated that the appointment of "*some* other independent decisionmaker" (emphasis added) would

satisfy due process where a decision by a parolee's own parole officer would not, even if the other officer were merely "someone such as a parole officer other than the one who has made the report of parole violations or has recommended revocation." 408 U.S. at 486, 92 S.Ct. at 2603. The Court expressly declined to require that the revocation decision be made by a "judicial officer" or even by a " 'neutral and detached' officer." *Ibid.* In the instant case it is likewise necessary to conclude that the appointment by Reville of an officer to hear the objections would sufficiently attenuate the putative bias of Reville, absent grounds for disqualification of the particular officer appointed.

### Lack of Pre-deduction Hearing

In June, 1979 I denied defendant's motion to dismiss plaintiffs' Complaint as to the alleged deprivation of due process by the state's failure to provide a hearing prior to the deduction of penalty amounts from their salaries. At that time I noted that dismissal at that juncture would have been inappropriate because neither side had sufficiently delineated and analyzed the competing interests involved in relation to the requirements of due process and that plaintiffs had not yet introduced evidence from which factual conclusions could be drawn relevant to their claim that the statutory procedure is invalid as applied to them. At this time I note that plaintiffs have not, on their motion for summary judgment, pressed their argument concerning the application of the statutory procedures to them. Nor have plaintiffs yet so much as alleged extreme hardships of the kind that the court in *Cheeseman v. Carey*, 485 F.Supp. 203, 217–20 (S.D.N.Y.1980), deter-

have to occur before the monetary penalties assessed by the ESA's Assistant Regional Administrator could benefit his or her operations so as to become an incentive for unbalanced administration, and concluded: " '[U]nder a realistic appraisal of psychological tendencies and human weakness,' *Withrow v. Larkin*, 421 U.S. 35, 47 [95 S.Ct. 1456, 1464, 43 L.Ed.2d 712] (1975), it is exceedingly improbable that the assistant regional administrator's enforcement decision would be distorted by some ex-

pectation that all of these contingencies would simultaneously come to fruition" (446 U.S. at 252, 100 S.Ct. at 1618) and, consequently, that the challenged procedures did not violate due process standards of procedural fairness. In contrast, the penalties assessed in the instant case, according to a stipulation executed by the parties, were directly and immediately used to augment the Buffalo School District operating budget and defray its expenses.

mined justified a preliminary injunction requiring the state to extend Taylor Law strike penalty deductions from the salaries of plaintiffs-teachers in that case over a longer period of time than that prescribed by the statute. In any case, had plaintiffs here raised cogent arguments regarding the rate of deductions in relation to the constitutional validity of the Taylor Law's failure to provide pre-deduction hearings as applied to them, the decision of the United States Court of Appeals for the Second Circuit in *Cheeseman*, to the effect that "[t]he rate-of-deduction issue * * * now lacks one of the requisites of a live controversy, namely a 'real and immediate' threat of injury faced by any member of the plaintiff class" (623 F.2d 1387, 1392 (1980)), would apply to bar prosecution of such claims. Moreover, I conclude that plaintiffs have abandoned the "as applied" claim of invalidity. Consequently, summary judgment for defendants is appropriate on plaintiffs' claim that the imposition of fines against them without a pre-deduction hearing is invalid as applied.

■ Thus we are left only with plaintiffs' broad claim that the statutory procedures lack due process for the failure to provide pre-deduction hearings. This claim I now find to be authoritatively settled at this point in time in favor of defendants, by the United States Supreme Court's dismissal of the appeal from *Sanford v. Rockefeller*, 35 N.Y.2d 547, 364 N.Y.S.2d 450, 324 N.E.2d 113 (1974), "for want of a substantial federal question" (*Sanford v. Carey*, 421 U.S. 973, 95 S.Ct. 1972, 44 L.Ed.2d 465 (1975)), as noted in the decision of our Court of Appeals in *Cheeseman v. Carey, supra*, 623 F.2d at 1390 n.5. Plaintiffs have alleged no purported distinctions between the present case and *Sanford* that were not addressed and rejected in *Cheeseman*. Thus summary judgment for defendants on the broader due process claim regarding the lack of pre-deduction hearings is also appropriate at this time.

In accordance with the views expressed herein, plaintiffs' motion for class certification is hereby ORDERED granted. It is further hereby ORDERED that plaintiffs'

motion for summary judgment is denied and summary judgment for defendants is hereby ORDERED granted.